975 P.2d 75

STATE of Arizona, Appellee/Cross–Appellant.

v.

Oreste FULMINANTE, Appellant/Cross-Appellee.

No. CR–95–0160–AP.

Supreme Court of Arizona,
En Banc.

March 2, 1999.

Janet A. Napolitano, Arizona Attorney General, Phoenix, By: Paul J. McMurdie Gregory A. McCarthy Attorneys for State of Arizona.

Brockelman & Brodman, P.L.C.,Phoenix, By: James J. Belanger Attorneys for Oreste Fulminante.

## OPINION.

FELDMAN, Justice.

¶ 1 A jury found Defendant Oreste Fulminante guilty of first-degree, premeditated murder. The trial judge sentenced Defendant to death. We have considered Defendant's direct, automatic appeal of his murder conviction and death sentence and conclude his conviction and sentence must be reversed due to errors at trial. We have jurisdiction pursuant to Ariz. Const. art. VI, § 5(3), A.R.S. § 13–4031, and Rule 31.2(b), Ariz. R.Crim.P.

## FACTS AND PROCEDURAL HISTORY

### A. Background

¶ 2 In September 1982, Defendant lived in Phoenix with his wife, Mary, and his eleven-year-old stepdaughter, Jeneane. The three had moved from New Jersey two years earlier. Mary, the only employed family member, had become frustrated with Defendant's failure to obtain employment. Defendant had a highly strained relationship with Jeneane and often blamed her for his deteriorating relationship with Mary. On one occasion, he physically disciplined her for coming home late from school, and after the police came to the house to investigate the incident, he threatened her. Jeneane had expressed fear and dislike of Defendant to people outside the family, including her school principal, another school employee, and a friend's parent.

¶ 3 On September 6, 1982, Mary checked into the hospital for surgery. Before leaving for the hospital, she told Defendant she would leave him if he did not have a job by the time she fully recovered from her surgery. During the day of September 13, Defendant briefly visited Mary in the hospital. As she listened to Defendant express his irritation with Jeneane, Mary noted that his breath smelled strongly of alcohol. Early that evening, Defendant spoke with Mary on the telephone and told her he was preparing a chicken dinner for Jeneane and himself. Defendant visited Mary again that evening. He later told police that he visited from approximately 6:30 until 8:15 p.m., but another witness testified that Defendant arrived shortly before 8:00 p.m. Mary testified that while she was uncertain exactly when he arrived that evening, Defendant usually arrived close to 8:00 p.m. when visiting hours ended. During the evening visit, Defendant explained that Jeneane had not accompanied him because she was home doing schoolwork.

¶ 4 At approximately two the next morning, Defendant telephoned the Mesa Police Department to report Jeneane missing. Later that morning, when Defendant brought Mary home from the hospital, he told her Jeneane had not come home the previous night. He said that when he realized Jeneane was missing, he first looked around the house, then around the neighborhood door-to-door, and then used his motorcycle to continue searching for her. When Mary questioned him on the details of his search, he admitted he had not gone door-to-door. At this point, Mary and Defendant both went through the neighborhood looking for Jeneane. Sometime after Mary returned to the house, she discovered that Defendant's pistol

was missing. When the police visited their home on September 15, the Fulminantes reported the missing pistol.

¶ 5 At about 6:00 a.m. on September 16, Jeneane's decomposed body was found in a desert wash approximately eleven miles from the Fulminantes' home. There were two gunshot wounds to her head and clumps of hair near her body. A long, narrow cloth was wrapped loosely around her neck. Her pants had been undone, the waistband resting below her waist, while the elastic of her underpants was rolled under. Police later recovered a spent bullet from the ground near the place where Jeneane's body was discovered.

¶ 6 The autopsy revealed that Jeneane died of the gunshot wounds. Gunpowder in the entry wounds suggested the shots had been fired at close range. Lead fragments were recovered from the brain. Testing of swabs taken from the victim's oral, vaginal, and rectal cavities proved inconclusive of whether Jeneane had been sexually abused. It was possible this was due to decomposition of the body. Pathologists did find that at the time of her death, Jeneane's stomach had been full and its contents included "meat." Based on the digestive stage of the meat, the experts determined that Jeneane died within two hours of her last meal. Because the stomach contents were not preserved for further testing after the autopsy, it is not known whether chicken was present.

¶ 7 Defendant told detectives he had recently sold one of his rifles for bread and milk and purchased an extra barrel for his pistol while Mary was in the hospital. Police later discovered that on September 13, Defendant traded his rifle for eighty dollars cash and a second barrel for his .357 Dan Wesson revolver. The extra barrel was also missing from the Fulminante home. Ballistics tests indicated the wounds on Jeneane's body were made by either .357 or .38 caliber bullets. The wounds were most consistent with a .357, and a .357 is compatible with a .38. The police recovered a box of .357 and .38 caliber ammunition during a consensual search of the Fulminantes' house.

¶ 8 Defendant left Phoenix alone on October 11, 1982. Soon after, he was arrested in New Jersey as a felon in possession of a firearm. He was convicted and served a two-year sentence. Shortly after his release, Defendant was again arrested and convicted for possessing a firearm and received another two-year sentence. While serving this term, Defendant became acquainted with Sarivola, an inmate secretly serving as a paid FBI informant. Sarivola had heard a rumor that Defendant was suspected of killing a child. Defendant initially denied the rumor, but Sarivola's FBI contact told him to find out more. Capitalizing on the fact that Defendant had been receiving rough treatment from other inmates, and offering protection for truth, Sarivola induced Defendant to confess. When Defendant was released from prison, Sarivola, who had been released earlier, and his fiancee, Donna, picked up Defendant at the prison. While in the car, Defendant told Donna that he had killed a little girl in Arizona.

## B. The first trial

¶ 9 Defendant was eventually arrested and returned to Arizona to stand trial for Jeneane's murder. Based in great part on his confessions to Sarivola and Donna, Defendant was convicted and sentenced to death. We reversed that conviction on the grounds that Defendant's confession to Sarivola was involuntary and its admission was structural error. *State v. Fulminante*, 161 Ariz. 237, 262, 778 P.2d 602, 627 (1988) (hereinafter *Fulminante I*). The United States Supreme Court agreed the confession was involuntary but disagreed with our finding of structural error and held that harmless error analysis applies to coerced confessions. *Arizona v. Fulminante*, 499 U.S. 279, 295, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991) (hereinafter *Fulminante II*). Despite applying the harmless error standard, the Court found the admission of the coerced Sarivola confession was *prejudicial* error. *Id.* at 302, 111 S.Ct. at 1261. The Court further concluded that the credibility of Donna's testimony about the second confession was bolstered by the Sarivola confession, reasoning that successful prosecution depended on the jury believing the two confessions. Without them, the Court thought it "unlikely" Defendant could

have been prosecuted in light of weak evidence that would have been "insufficient to convict." *Id.* at 297, 111 S.Ct. at 1258. The Court therefore affirmed our judgment remanding the case for a new trial.

## C. The second trial

¶ 10  After the appeals of the first case had been resolved, the trial judge remanded the case to a new grand jury. The state presented Defendant's confession to Sarivola and the grand jury indicted. At the second trial, the state did not offer either of the confessions, but Defendant was again convicted and sentenced to death. We now consider the direct appeal from the second trial. Defendant raises several significant issues. We agree with Defendant's argument that admission of Jeneane's hearsay statements, reflecting her belief about Defendant's future conduct, was prejudicial error. We therefore need not address the serious issues arising from the state's failure to timely disclose the discovery of physical evidence.[1]  For purposes of judicial economy, we also discuss other issues likely to recur on retrial. We first address issues potentially dispositive of retrial—those pertaining to sufficiency of the evidence.

## DISCUSSION

## A. Whether the trial judge should have dismissed the indictment

¶ 11  Defendant argues that the indictment should have been dismissed because his confession, found involuntary and inadmissible on appeal from his first trial, was used before the grand jury. Defendant claims this violated his rights under *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). *Stirone*, however, does not support Defendant's argument. Evidence presented to a grand jury need not be admissible in trial. *See State ex rel. Berger v. Myers*, 108 Ariz. 248, 250, 495 P.2d 844, 846 (1972). Thus, we find no error in use of this confession before the grand jury.

## B. Whether we are bound by the United States Supreme Court's comments on sufficiency of the evidence

¶ 12  In *Fulminante II*, the United States Supreme Court held that Defendant's confession was coerced and reviewed the record to determine whether its admission was harmless error. 499 U.S. at 297–302, 111 S.Ct. at 1258–61. The Court found the admission prejudicial, in part because

both the trial court and the State recognized that a successful prosecution depended on the jury believing the two confessions. Absent the confessions, it is unlikely that Fulminante would have been prosecuted at all, because the physical evidence from the scene and the other circumstantial evidence would have been insufficient to convict.

*Id.* at 297, 111 S.Ct. at 1258. Presumably, had the Court's statements been the law of the case, the trial judge would have had to dismiss the indictment. Defendant fails to assert this argument on appeal but instead argues that the statements should have been read to the jurors or included in the jury instructions.

¶ 13  Assuming, *arguendo,* that the Supreme Court's statements were more than merely descriptive of the views of the trial judge and the prosecutor and could thus be considered the law of the case, the present case falls within exceptions to the rule. The law of the case will not be applied if "the issue was not actually decided in the first decision or the decision is ambiguous." *Dancing Sunshines Lounge v. Industrial Comm'n,* 149 Ariz. 480, 483, 720 P.2d 81, 84 (1986). The United States Supreme Court was not required to and did not actually determine whether the evidence was sufficient to support a conviction. The issue before the Court was whether admission of the coerced confession was prejudicial. Obviously, erroneously admitted evidence may be prejudicial even if the other evidence is sufficient to support a verdict. For similar reasons, the principle of collateral estoppel does not apply. *See State v. Berry,* 133 Ariz. 264,

---

1. The prosecution failed during trial to disclose discovery of a speck of gunpowder. This failure allowed the defense to commit itself to a theory that became implausible once the physical evidence was subsequently admitted through testimony of the state's rebuttal witness.

268, 650 P.2d 1246, 1250 (App.1982); *see also* Annotation, *Modern status of doctrine of res judicata in criminal cases,* 9 A.L.R.3d 203, 214 (1966).

■ ¶ 14 Moreover, the law of the case doctrine will not be applied when there has been a substantial change in the evidence. *Dancing Sunshines,* 149 Ariz. at 483, 720 P.2d at 84. At Defendant's second trial the state presented a number of witnesses who had not testified at the first. For example, the officer who discovered Jeneane's body testified to the location and condition of the body, the hilly layout of the land that might have obscured the body for a few days, and precautions taken to not disturb the murder scene. Lee Houle testified that he and his wife took Defendant to the Phoenix bus depot two weeks after Jeneane's death. He further testified that Defendant arranged to correspond with Mrs. Houle by sending letters through her friends in Louisiana, who would put them in a new envelope and forward them to Arizona, presumably so that Defendant's name and address as the sender would be concealed. Without revealing his location, Defendant telephoned Mr. Houle a week after he left town to see what had developed in the case. Defendant laughed about the police looking for him, saying they could look for him anywhere from the Atlantic to the Pacific. Houle's testimony was used to advance the state's theory that Defendant displayed a consciousness of guilt by leaving town not long after Jeneane's death and making efforts to conceal his whereabouts.

¶ 15 The testimony of these and other new witnesses strengthened prior arguments and supported new ones. We thus conclude we are not bound by the Court's comments on sufficiency of the evidence.

## C. Whether the trial judge erred by refusing to instruct the jury about the weight of the evidence

■ ¶ 16 In Defendant's first grand jury proceeding and trial, the prosecutor made several statements to the judge effectively conceding that, without Defendant's confession, the state's case was insufficient to prove guilt beyond a reasonable doubt. Defendant moved to have those statements read into evidence at the beginning of the second trial and subsequently incorporated into jury instructions. Defendant argues that the prosecutor's statements constituted judicial admissions and therefore should have been read to the jury as if they were stipulations of the parties.

¶ 17 A judicial admission has been defined as follows:

An express waiver made in court or preparatory to trial by the party or his attorney conceding for the purposes of the trial the truth of some alleged *fact,* has the effect of a confessory pleading, in that the *fact* is thereafter to be taken for granted; so that the one party need offer no evidence to prove it and the other is not allowed to disprove it. . . . It is, in truth, a substitute for evidence, in that it does away with the need for evidence.

9 WIGMORE, EVIDENCE § 2588, at 281 (Chadbourn rev.1981) (emphasis added) (cited in *Clark Equip. Co. v. Arizona Prop. & Cas. Ins. Guar. Fund,* 189 Ariz. 433, 439, 943 P.2d 793, 799 (App.1997)). The prosecutor's statements from the first trial reflect only his opinion of the law, rather than fact, and thus are not judicial admissions.

■ ¶ 18 Defendant also argues that the statements were admissions of a party opponent and should have been read into evidence under Rule 801(d)(2)(C) and (D), Ariz.R.Evid. These rules, however, apply to factual statements by agents or employees, not opinions on law from the state's counsel. Thus, Defendant's argument is without merit.

## D. Whether the evidence was sufficient to sustain the verdict

■ ¶ 19 The trial judge denied Defendant's motion for judgment of acquittal at the close of the state's case and also his motion for a directed verdict at the close of evidence. Defendant now challenges those denials, correctly arguing that if the evidence at trial was insufficient to support the conviction, the charges must be dismissed. *State v. Mathers,* 165 Ariz. 64, 66, 796 P.2d 866, 868 (1990). To decide the question, we must consider the admissible evidence of Defendant's guilt in a

light most favorable to supporting the verdict. *State v. Arredondo*, 155 Ariz. 314, 316, 746 P.2d 484, 486 (1987).

¶ 20 Defendant had a strained relationship with Jeneane. On one occasion two years before her death, he spanked Jeneane and she called the police; he threatened to kill her if she again embarrassed him in that way. He had been drinking on the day Jeneane disappeared. Williams, the Fulminantes' neighbor, said he saw Jeneane about 10:00 the night of her disappearance leaning against a motorcycle in the Fulminantes' front yard. Defendant, however, told Williams that the girl he had seen was his niece; but Defendant has no niece. Defendant told police that Williams could not have seen a girl in front of his house because the streetlights and porch light had been out; contrary evidence established that Defendant fabricated this fact and that both lights had been on. Defendant falsely told police that he had trained Jeneane in the use of firearms. While Jeneane was still missing, Defendant manufactured a theory to explain his missing handgun—that Jeneane's abductors left her bound and gagged in front of the house while they went inside to take his pistol. Defendant gave several accounts of the events surrounding Jeneane's disappearance—what time he telephoned the police and how he conducted his search for her.

¶ 21 The state also argues that the evidence regarding Defendant's gun was incriminating: he owned a .357 Dan Wesson pistol that was missing after the killing; when purchasing the Dan Wesson, Defendant told his wife he liked his gun because "the barrels are very easily interchangeable, and it would be very easy to kill someone with such a weapon"; he traded a rifle for an extra barrel for the pistol the same day Jeneane disappeared, yet did not reveal that information to police until four days later; and the extra barrel was also missing after the killing.

¶ 22 Additionally, the ballistics evidence was consistent with guilt: Defendant possessed ammunition of the same caliber that probably killed Jeneane; lead retrieved from Jeneane's head was from the same batch of ammunition as the lead found in Defendant's home; the projectile jacket recovered from the crime scene could have been fired from a .357 Dan Wesson; the projectile was fired from a dirty gun, and spent .357 cartridges retrieved from Defendant's home indicated they were also fired from a dirty gun; and finally, the projectile jacket found at the scene and those retrieved from Defendant's home indicated a similar manufacturer.

¶ 23 Defendant contends the state's circumstantial evidence is insufficient in light of the defense evidence. The person who discovered Jeneane's body walked the same route five times daily for the two previous days but did not see her until the third day. Additional evidence at the crime scene indicated Jeneane was not killed there. Further, the projectile jacket found at the scene was not detected when the body was first discovered, and testing showed it had not been fired through Jeneane's head. Forensic pathologists concurred that Jeneane died within two hours of her last meal, which Defendant claims to have made for her around 6:00 p.m., and Defendant told police he was with Mary from 6:30 to 8:30 p.m. Even if these facts are true, none is per se exculpatory. Thus, they go to the weight, rather than the sufficiency of the evidence. *State v. Hardin*, 99 Ariz. 56, 59, 406 P.2d 406, 409 (1965).

¶ 24 A directed verdict "of acquittal is appropriate where there is 'no substantial evidence to warrant a conviction.' Substantial evidence is more than a mere scintilla and is such proof that 'reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt.' " *Mathers*, 165 Ariz. at 67, 796 P.2d at 869. The question is whether, on the evidence presented, rational factfinders could find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560 (1979).

¶ 25 In *Mathers*, we found the state's evidence was insufficient despite the fact that the defendant travelled from California to Arizona with two persons involved in a murder at the destination. 165 Ariz. at 71, 796 P.2d at 873. In both *Mathers* and the present case, there was no direct evidence of the defendant's presence at the murder scene or participation in the murder. In several

cases, however, we have affirmed convictions premised primarily or entirely on circumstantial evidence. *See, e.g., State v. Spencer,* 176 Ariz. 36, 859 P.2d 146 (1993) (defendant was with victim and in control of her car immediately prior to murder, withdrew all money from victim's bank account, and tire tracks at scene were consistent with victim's car, which defendant was videotaped selling to undercover officer); *State v. Hill,* 174 Ariz. 313, 848 P.2d 1375 (1993) (defendant argued with victim two weeks prior, possessed store receipts from where victim shopped, and shoe prints matching defendant's led from victim's truck to victim's home, where defendant was found).[2]

¶ 26 The instant case is troubling because, while there is more evidence of guilt than that presented in *Mathers,* there is no evidence directly or conclusively linking Defendant to the crime scene or the crime. At a minimum, we found such a talisman in the circumstantial evidence cases noted above. No particular piece of evidence, however, is required as a prerequisite for sufficiency. The totality of circumstances must add up to proof beyond a reasonable doubt. *Cf. Yates v. Mississippi,* 685 So.2d 715, 718 (1996) (applying a totality of circumstances test for sufficiency of evidence); *Commonwealth v. Jackson,* 540 Pa. 556, 659 A.2d 549, 550 (1995) (same); *Urrutia v. Wyoming,* 924 P.2d 965, 967 (1996) (same).

¶ 27 In reviewing the evidence, we must draw all reasonable inferences that support the verdict. *State v. Girdler,* 138 Ariz. 482, 488, 675 P.2d 1301, 1307 (1983). In that light, the state's evidence may be summarized as demonstrating that Defendant made several false, misleading, and inconsistent statements to police, other witnesses, and his wife—showing consciousness of guilt. Defendant had a bad relationship with Jeneane and perceived her as a threat to his marriage—evidence of motive. Mary was in the hospital—providing an opportunity to commit the murder. Defendant had a gun and ammunition of the same type used to kill Jeneane and purchased an extra barrel for the gun the day Jeneane disappeared. Both items were missing when police investigated, and Defendant could not rationally explain their disappearance—strengthening an inference they might have been used to kill Jeneane.

¶ 28 From this we find sufficient evidence from which the jury could have pieced together a web of suspicious circumstances tight enough that a reasonable person could conclude, beyond a reasonable doubt, that Defendant was the perpetrator. While each element of the offense must be established beyond a reasonable doubt, each supporting fact need not be. 2 JOHN W. STRONG ET AL., MCCORMICK ON EVIDENCE § 341, at 446 n. 6 (4th ed.1992). Taken as a whole, the admissible evidence was thin[3] but sufficient to support a verdict that Defendant was the killer. Premeditation, however, is a somewhat different issue, which we address later.

### E. Whether Jeneane's statements were admissible through a hearsay exception

¶ 29 Defendant claims the trial judge erred in denying a motion in limine and in overruling objections to hearsay testimony that Jeneane believed her stepfather was going to kill her. Defendant challenged these statements as inadmissible hearsay and

---

2. *See also State v. Spears,* 184 Ariz. 277, 908 P.2d 1062 (1996) (California defendant was in possession of victim's truck and title thereto, transferred while defendant was in Phoenix, and shell casing found consistent with victim's wound was fired from defendant's gun); *State v. Murray,* 184 Ariz. 9, 906 P.2d 542 (1995) (defendant was in vicinity of murder site, was apprehended with evidence from the scene, and blood and footprints matched). In each of these cases, some piece of evidence linked the defendant to either the crime scene or the victim in an incriminating fashion.

3. Police never found the murder weapon. The state only proved Defendant's missing pistol was of a brand and caliber that could have been used to commit the murder. However, Dan Wesson handguns are made by Smith & Wesson and are not an unusual make or caliber. Further, while the state's lead comparisons established that ammunition retrieved from Defendant's home was elementally indistinguishable from lead fragments removed from the victim, such evidence was not strongly probative, as there could have been almost one million rounds of ammunition produced with the same characteristics. Reporter's Transcript, May 31, 1994, at 59.

properly preserved the issue for appeal. The following exchange took place during direct examination of Nancy Hays, the mother of a friend of Jeneane's:

STATE: Did Jeneane say anything to you as she was leaving?

HAYS: Jeneane was crying.

DEFENSE: Objection, Your Honor, hearsay.

THE COURT: Overruled. You may continue your answer.

HAYS: ... The last thing she said to me was "He's going to kill me," and that's exactly what she said.

Reporter's Transcript (R.T.), May 25, 1994, at 146. The following exchanges took place during direct examination of Charlamagne Klug, a teacher's aid at Jeneane's school:

STATE: And what did she tell you that she heard her stepfather say?

KLUG: She heard, overheard him saying that—

DEFENSE: Objection, hearsay ... and underlying hearsay as well.

THE COURT: Overruled. You may continue.

KLUG: Overheard him telling her mom they had to get rid of Jeneane permanently.

\* \* \*

STATE: Did she tell you she was afraid of something?

KLUG: Yes, she did.

STATE: And what did she tell you she was afraid of?

KLUG: Her statement was "I'm afraid he's going to kill me."

STATE: Who was she referring to?

KLUG: Her stepfather.

R.T., May 26, 1994, at 152, 154.

¶ 30 The state concedes the statements are hearsay but argues they are admissible under Rule 803(3), Ariz.R.Evid., which allows statements of the declarant's "then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)," but does not allow statements "of a memory or belief to prove the fact remembered or believed."

¶ 31 The rationale for Rule 803(3) rests on two assumptions: (1) that declarant's statements have special reliability due to spontaneity and probable sincerity; and (2) because declarant's knowledge of his or her state of mind is inherently superior to any external, circumstantial account, there is a "fair necessity" to use the declarant's statements. 6 WIGMORE, EVIDENCE § 1714, at 90 (Chadbourn rev.1976).

¶ 32 Admissibility under the state-of-mind exception requires that the offer be connected to the declarant's state of mind at the time the statement was made and be relevant for a purpose independent from any prohibited use of hearsay. *See United States v. Brown*, 490 F.2d 758 (D.C.Cir.1973); *State v. Christensen*, 129 Ariz. 32, 36, 628 P.2d 580, 584 (1981) (listing specific instances in the context of a murder case when state-of-mind evidence is admissible). Also, the statement must describe declarant's present feeling or future intention rather than look backward, describing declarant's past memory or belief about another's conduct. *See Shepard v. United States*, 290 U.S. 96, 105–06, 54 S.Ct. 22, 26, 78 L.Ed. 196 (1933) (using the state-of-mind exception to admit proof of memory or belief would destroy the hearsay rule). Finally, the statement must be limited to a declaration showing the state of mind and not include a description of the factual occurrence that engendered that state of mind. *See State v. Wood*, 180 Ariz. 53, 63, 881 P.2d 1158, 1168 (1994).

**1. Relevance or motive**

¶ 33 The cases speak of two levels of relevance. *See Brown*, 490 F.2d at 774. To be relevant, the declarant's statement must first be relevant to prove the state of mind, though not to prove the truth of any other facts included in the statement. Second, the state of mind itself must be relevant to an essential element of the claim or defense (e.g., intent) or tend to prove relevant conduct of the declarant. *See* PAUL R. RICE, EVIDENCE: COMMON LAW AND FEDERAL RULES OF EVIDENCE § 5.02, at 488–89 (1st ed.1986). Thus, the hearsay evidence must

tend to prove the declarant's previous or subsequent actions rather than those of another person. *Id.*; *see also* M. UDALL & J. LIVERMORE, ARIZONA PRACTICE: LAW OF EVIDENCE § 128, at 274–278 ( 3d ed.1991).

¶ 34 In deciding *Christensen,* we relied not only on *Shepard* but also *Brown,* still one of the leading cases that discusses the Rule 803(3) exception. 129 Ariz. at 36, 628 P.2d at 584. *Brown* held that Rule 803(3) can only be used if the declarant's state of mind is probative of an ultimate issue in the case and the statement primarily shows the state of mind of the declarant, not the defendant. 490 F.2d at 774–80. Here, the state argues the hearsay is relevant because Jeneane's statements showed her dislike for Defendant, thus establishing a bad relationship and helping to prove motive, an ultimate issue in the case. We have expressly held that a victim's state of mind is relevant to show a defendant's motive under Rule 803(3). *See Wood,* 180 Ariz. at 62–63, 881 P.2d at 1167–68; *Fulminante I,* 161 Ariz. at 251, 778 P.2d at 616.

¶ 35 In *Fulminante I,* Jeneane's mother testified that Jeneane said she stayed the night at a friend's house without permission because she did not want to be with Defendant. We held this was admissible under Rule 803(3) to refute Defendant's factual claim of a good relationship with Jeneane and to establish his motive. 161 Ariz. at 251, 778 P.2d at 616. We reasoned:

> The wish of the victim not to live in the same house with the defendant was relevant in this case because it was used to show that the victim and defendant did not get along and ill feelings existed between the parties. Establishing that the victim disliked the defendant and hence that the family situation was not harmonious, *were factors in disputing defendant's claims that he had no reason or motive to murder the victim.* Additionally, since the defendant claimed that the victim and he got along well, and no feelings of ill will between the parties existed, the statements of the victim's mother are *relevant to dispute this contention.*

This kind of statement is unlike the one recently held inadmissible and irrelevant

by this court. *State v. Charo,* 156 Ariz. 561, 564, 754 P.2d 288, 291 (1988). *In that case, this court held that the victim's fear is irrelevant to prove the defendant's conduct. Id.* at 565, 754 P.2d at 292. *Conversely, in this case, the evidence of the victim's dislike, as opposed to fear, of the defendant is not being used to show the defendant's conduct; rather it is being used as evidence of the defendant's motive for killing the victim.*

*Id.* (emphasis added) (some citations omitted). Because *Fulminante I* found the hearsay admissible when Defendant raised the issue of motive, we may have left doubt whether the state could offer such evidence to prove motive when, as in the present case, the state raised the issue. Recently, however, we held that under Rule 803(3) the state could offer a victim's statements of fear and intent to end her relationship with the defendant to show the defendant's motive without requiring the defendant to have first claimed lack of motive. *Wood,* 180 Ariz. at 62–63, 881 P.2d at 1167–68. We believe the better rule disregards defense strategy and recognizes the relevance of state-of-mind evidence offered by either party to prove the defendant's motive—provided the statement offered does not offend the second part of the rule prohibiting hearsay to "prove the fact remembered or believed."

## 2. The fact remembered or believed

¶ 36 The text of Arizona's Rule 803(3) admits state-of-mind hearsay "not including a statement of memory or belief to prove the fact remembered or believed." The Federal Rules Advisory Committee, referring to the federal rule that is the basis for Arizona's Rule 803(3) exception, said that

> [t]he exclusion of "statements of memory or belief to prove the fact remembered or believed" is necessary to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hearsay statement, to serve as the basis for an inference of a happening of the event which produced the state of mind.

Rule 803(3), Fed.R.Evid., advisory committee's note (citing *Shepard,* 290 U.S. 96, 54

S.Ct. 22, 78 L.Ed. 196). In other words, hearsay statements describing the declarant's state of mind are relevant to infer the declarant's conduct, but the declarant's statement of memory or belief cannot be admitted to prove the conduct of another.

¶ 37 In the first significant Rule 803(3) case after Arizona adopted its version of the Federal Rules of Evidence, the trial judge admitted a decedent's statements that she feared the defendant, that he had threatened her, and that he was "capable of anything." On appeal, we noted that the victim's statements specifically describing her memory of the defendant's past threats and her beliefs about the defendant's capabilities "were nothing more than statements of 'memory or belief to prove the fact remembered or believed.' Such assertions are not within the Rule 803(3) exception and were not admissible." *Christensen,* 129 Ariz. at 36, 628 P.2d at 584.

¶ 38 In a subsequent case, *State v. Charo,* the defendant was charged with first-degree murder, robbery, and forcible sexual assault. 156 Ariz. 561, 754 P.2d 288 (1988). A trial witness testified to a discussion with the victim two years prior to the crime. The victim told the witness that while away on vacation, defendant, alone with her in a hotel room, tried to sexually assault her. We held that "[l]ike the threat in *Christensen,* the testimony about ... what happened in the hotel was ... a statement of memory or belief ... offered to prove the truth of that memory or belief and it was not admissible." *Id.* at 564, 754 P.2d at 291. Thus, *Charo* and *Christensen* have excluded statements conveying a declarant's *memory* of another's past conduct or *belief* of another's future actions.

¶ 39 In *Wood,* after finding the victim's state of mind relevant, we relied on *Charo* and *Christensen* to reject a hearsay statement of the cause of her fear—that "[Defendant] had threatened her life." We held this statement violated the prohibition of using memory or belief to "prove the fact remembered or believed." 180 Ariz. at 63, 881 P.2d at 1168. Many authorities agree with *Wood*'s premise that while the state of mind, such as fear or dislike, may be admissible if

relevant, events or beliefs giving rise to that state of mind are not. *See, e.g., United States v. Joe,* 8 F.3d 1488, 1492–93 (10th Cir.1993) (finding declarant's statement of fear admissible but its basis, that husband was going to kill her, inadmissible); *United States v. Liu,* 960 F.2d 449 (5th Cir.1992); *United States v. Emmert,* 829 F.2d 805, 810 (9th Cir.1987) (holding trial court properly excluded testimony that included statement describing defendant's threats that caused fear).

¶ 40 In *Liu,* the Fifth Circuit upheld the trial judge's decision to allow statements that the victim "was scared," without allowing the witness to relate the cause of the victim's fear. In reaching the result, the court quoted with approval from its previous decision in *United States v. Cohen:*

> That rule [803(3)] by its own terms excepts from the ban on hearsay such statements as might have been made by Cohen of his then existing state of mind or emotion, but expressly excludes from the operation of the rule a statement of belief to prove the fact believed.... But the state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind. If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition— "I'm scared"—and not belief—"I'm scared because Galkin threatened me."

*Liu,* 960 F.2d at 452 (quoting *U.S. v. Cohen,* 631 F.2d 1223, 1225 (5th Cir.1980) (footnote omitted)); *see also* M. UDALL ET AL., *supra,* § 128. This reasoning is consistent with our holdings in *Christensen, Charo,* and *Wood,* which bar the portion of the statement reporting a victim's memory of past incident or belief.

▮ ¶ 41 Even though Defendant did not claim at the second trial that he and Jeneane had a good relationship, Jeneane's dislike and fear of her stepfather are rele-

vant, although perhaps minimally,[4] to the issue of motive, and admission of her statements of dislike and fear were permitted under the rule. *See Wood,* 180 Ariz. at 62–63, 881 P.2d at 1167–68. But two of Jeneane's contested hearsay statements, "He's going to kill me" and "I'm afraid he's going to kill me," directly report Jeneane's statement of *belief* about Defendant's future conduct and thus violate the rule. *See id.* at 65, 881 P.2d at 1170; *Christensen,* 129 Ariz. at 36, 628 P.2d at 584; M. UDALL ET AL., *supra,* § 128, at 274–75 and n. 4. The third statement, reporting the conversation Jeneane heard between her stepfather and her mother, clearly reflects Jeneane's *memory* of a past fact and is also precluded by the last part of Rule 803(3).

¶ 42 In *Wood,* the defendant's conduct and identity were undisputed, leaving only his mental state at issue, but we held hearsay relating the declarant's memory of past threats inadmissible. 180 Ariz. at 62–63, 881 P.2d at 1167–68. Here, Defendant's identity and conduct are crucial issues. *A fortiori,* the statements offered have the primary effect of proving the factual basis of Jeneane's state of mind: that her stepfather threatened her and would kill her. Such an inference is exactly what is proscribed by the last clause of the rule. *See State v. Krone,* 182 Ariz. 319, 324, 897 P.2d 621, 626 (1995); *Navarro v. State,* 863 S.W.2d 191, 197 (Tex.App.1993); Rule 803(3), Fed.R.Evid., advisory committee's note. Such testimony reflects the declarant's state of mind only if the facts asserted in the statement are taken as true, which is what the rule forbids. *See* 2 STRONG ET AL., *supra,* § 276, at 244–45. Thus, all three of the contested hearsay statements are inadmissible under Rule 803(3).

### 3. Identity

¶ 43 Relying on *State v. Mauro,* however, the state argues that the statements should be admitted to prove the identity of Jeneane's murderer. 159 Ariz. 186, 766 P.2d 59 (1988). Over the past seventeen years, there has been some confusion about whether Ari-

zona's Rule 803(3) permits admission of statements showing a homicide victim's state of mind to prove the *identity* of the murderer. Prior to Arizona's adoption of the Federal Rules of Evidence, we held that a victim's statements that she feared the defendant would kill her were admissible under the state-of-mind exception. *State v. Gause,* 107 Ariz. 491, 493–95, 489 P.2d 830, 832–34 (1971), *judgment vacated by Gause v. Arizona,* 409 U.S. 815, 93 S.Ct. 192, 34 L.Ed.2d 71 (1972). Before *Gause,* our cases held that the victim's state of mind was relevant only in instances "of accident, suicide, or self defense," situations in which the declarant's state of mind is relevant because it provides a basis from which to infer the *declarant's* conduct. *Id.* at 494–95, 489 P.2d at 833–34. In *Gause,* we "brush[ed] aside the sophistry"of this limited approach and allowed a statement that the victim was afraid her husband would kill her as probative on the issue of her killer's identity. *Id.* at 495, 489 P.2d at 834. This permits use of a declarant's statement to prove the *defendant's* conduct, a use that requires the factfinder to assume the truth of the facts remembered or believed by the declarant.

¶ 44 In 1981, after adoption of the federal rules, we considered a case with hearsay statements similar to those in *Gause* and the present case. The victim made three statements to the effect that she feared the defendant, that he had threatened her, and that he was "capable of anything." *Christensen,* 129 Ariz. at 36, 628 P.2d at 583. This court found the last two statements inadmissible under Rule 803(3)'s state-of-mind exception. *Id.* Although the first statement, reflecting only the victim's fear, was possibly admissible under the rule, but only if relevant to a limited purpose under Rule 803(3), we commented that a "victim's state of mind is *only* relevant when *identity* or the defense of accident, suicide or self-defense is raised." *Id.* (emphasis added). Including identity in this list was gratuitous because it had never before been included in the pre-*Gause* cases that listed only accident, suicide, or self de-

---

4. Even when evidence is independently relevant under Rule 803(3), it must still pass the threshold of Rule 403. We find no abuse of discretion in the trial judge's finding that the prejudicial na-

ture of the evidence did not substantially outweigh the probative value of Jeneane's statement of fear.

fense. Moreover, no issue was raised in *Christensen* that justified adding identity to the list. *See* 129 Ariz. at 36, 628 P.2d at 584. *Christensen* actually holds that statements of the declarant's memory of threats and belief that the defendant was "capable of anything" were not within the Rule 803(3) exception and was thus inadmissible. Later cases, we believe, clarify that a statement of fear is inadmissible to prove identity.

¶ 45 Our 1988 opinion in *Charo* overrruled *Gause* and held that Rule 803(3) does not permit admission of a victim's statements of fear of the defendant to prove the defendant's conduct. 156 Ariz. at 564–65, 754 P.2d at 291–92. The state argued that the victim's fear of the defendant was relevant to the identity of her murderer. We disagreed, reasoning that

> the idea of proving that a victim was afraid of the defendant as admissible to prove identity has been thoroughly rejected. *People v. Armendariz*, 37 Cal.3d 573, 581, 209 Cal.Rptr. 664, 672, 693 P.2d 243, 251 (1984) ("A victim's out-of-court statements of fear of an accused are admissible ... only when the *victim's conduct* in conformity with that fear is in dispute. Absent such dispute, the statements are irrelevant."). The Arizona Rules of Evidence are consonant with the above view on the state of mind exception and, therefore, require that the rule in *Gause* be rejected.

*Id.* (emphasis added) (citations omitted). We explained the reasoning of past cases limiting relevance of state-of-mind statements to suicide and self-defense, stating that "a hearsay statement of fear by a murder victim was admissible and relevant to prove or explain *subsequent acts of the decedent*, but not as a basis to infer a defendant's conduct." *Id.* at 564, 754 P.2d at 291 (emphasis added).

¶ 46 Within a year of our decision in *Charo*, we again muddied the waters in *Mauro*, in which we held admissible a child homicide victim's statement that "*his dad would kill him if he was caught jumping on a bed.*" 159 Ariz. at 198, 766 P.2d at 71. In a short discussion of the issue, without analysis of

*Christensen* and without citing *Charo*, we said:

> To be admissible, the hearsay must be relevant. *State v. Christensen*, 129 Ariz. 32, 36, 628 P.2d 580, 584 (1981). A victim's state of mind is relevant only when identity or the defense of accident, suicide or self-defense is raised. 129 Ariz. at 36, 628 P.2d at 584. Because the identity of the child abuser was an issue in this case and the statements revealed the victim's mental feeling, we hold that the victim's hearsay statements were covered by the state of mind exception in rule 803(3), and were therefore properly admitted.

*Id.* But again, the child's statement reflected one of two things: the child's memory of his father's past threat or his belief about his father's future conduct. Thus, the statement of identity in *Mauro* falls squarely within the prohibition of the last clause of Rule 803(3).

¶ 47 In *Wood*, our most recent venture into this area, we held hearsay testimony of a victim's statement that "[n]obody is going to stop [Defendant] until he kills somebody" outside the Rule 803(3) exception "because it is a statement of belief to prove the fact believed." 180 Ariz. at 65, 881 P.2d at 1170. We reached the same conclusion about one victim's hearsay statement that the defendant had threatened another victim because it "does not reflect [the victim's] state of mind but rather appears to be a statement [of] 'memory or belief to prove the fact remembered or believed.'" *Id.* at 63, 881 P.2d at 1168. *Charo* held that evidence of the victim's fear of the defendant is not relevant to prove the *defendant's conduct or identity*. 156 Ariz. at 563–65, 754 P.2d at 291–92. As will be seen in the next section, that is exactly how the state used the evidence in the present case. We believe *Charo* and *Wood* interpret the rule correctly. We also believe this is the majority rule and the rule contemplated by the federal committee and endorsed by the authorities in the field. *See* Rule 803(3), Fed.R.Evid., advisory committee's notes (Rule 803(3) statement can prove only declarant's future conduct, "not the future conduct of another person"); *see also Shepard*, 290 U.S. at 97, 54 S.Ct. at 23;[5] 2

---

5. The United States Supreme Court has said as

much. If, in *Shepard*, the victim's statement to

STRONG ET AL., *supra*, § 276, at 244–45 (hearsay evidence cannot be used to prove defendant's conduct or state of mind but can have legitimate use to prove declarant's conduct).

¶ 48 Thus, Arizona's evidence hornbook rightly criticizes our inconsistency on the issue of identity constituting relevance under Rule 803(3). M. UDALL ET AL., *supra*, § 128, at 274–75 and n. 4. The text notes that the "risky" *Gause* rule was overruled in *Charo*, which held that "a statement of fear offered to prove facts justifying fear and to identify the defendant is inadmissible. [*Mauro* indicates] that [o]ld habits, however, die hard." *Id.* We follow the great weight of authority as well as our own cases and rely on Rule 803's text, which squarely proscribes admission of a declarant's memory or belief to prove the matter remembered or believed. Thus, we refuse to revive *Gause*, notwithstanding the comment in *Mauro*. Evidence of a victim's state of mind is not admissible to establish the conduct of another and thus the identity of the perpetrator of the crime. We find all three hearsay statements contested here inadmissible as a reflection of Jeneane's memory or belief and thus precluded by Rule 803(3) and our decisions in *Christensen, Charo,* and *Wood.*

### 4. Harmless error analysis

¶ 49 Having concluded that the testimony by witnesses Hays and Klug relating Jeneane's statements of memory or belief was inadmissible hearsay, we must next determine whether the error was harmless. *See Krone,* 182 Ariz. at 321, 897 P.2d at 623. "Prejudicial error and harmless error rely upon the same legal test. For error to be harmless, and therefore not prejudicial, we must be able to say 'beyond a reasonable doubt, that the error did not contribute to or affect the verdict.'" *Id.* (quoting *State v. Bible,* 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993) (citations omitted)).

¶ 50 To determine whether Defendant was prejudiced, we must look to the impact of the inadmissible statements in light of the totality of properly admitted evidence. *See Wood,* 180 Ariz. at 63, 881 P.2d at 1168. First, we consider the likely effect on the jury of the improperly admitted hearsay. *See State v. Williams,* 133 Ariz. 220, 224, 650 P.2d 1202, 1207 (1982). Because the testimony was admitted without a limiting instruction, we must assume the jury could have considered the statements as asserting the truth of the matter testified to: Defendant's murderous intent. Moreover, we note that the prosecutor emphasized this evidence in his closing, arguing:

> And Jeneane was not unlike the boy who cried wolf. *Nancy Hays ignored her cry. Charlamagne Klug ignored her, Jeneane's, cry for help.* ... But its important that this jury here today not ignore Jeneane anymore.... *And Jeneane has spoken to us in this courtroom through this evidence. She is telling us who killed her* based on the evidence including defendant's statements on her relationship with him. And all I'm asking you to do is not ignore that, to not ignore that cry for help like that little boy who cried wolf....

R.T., June 20, 1994, at 222–23 (emphasis added). The manner in which the prosecutor used this evidence in his closing argument both illustrates the wisdom of the prohibition against using the state-of-mind exception to prove facts remembered or believed and refutes any contention "that this [hearsay] was a relatively unimportant piece of evidence." *Charo,* 156 Ariz. at 563, 754 P.2d at 290 (noting prosecutor's emphasis of improperly admitted evidence during closing argument in finding reversible error).

¶ 51 The state argues, however, that two properly admitted statements render the error harmless. First, Jeneane's mother, Mary, testified about Defendant's comments

---

an attending nurse that "Dr .Shepard has poisoned me" was inadmissible under the state-of-mind exception, then Jeneane's statement in the present case that Defendant would kill her must be equally inadmissible. *Cf. Shepard,* 290 U.S. at 98, 54 S.Ct. at 23. Jeneane's fear or dislike is relevant to Defendant's motive because it may tend to prove, marginally at least, a bad or even

hostile relationship, perhaps giving Defendant a reason to kill. Jeneane's consequent belief that Defendant would kill her also reflects her fear but goes beyond her state of mind and reflects her belief about Defendant's conduct. As such, it is proscribed by the last clause of Rule 803(3) if used to prove motive or identity.

after the incident two years before the murder when the police came to the house to investigate a report that Defendant spanked Jeneane:

Q: Have you ever said on another occasion that you remember the defendant saying to Jeneane, "I'll kill your fucking ass?"

A: I do recall him saying that to her.

R.T., May 25, 1994, at 210. Also, a friend of Mary's testified that she heard Defendant say he "couldn't wait until Jeneane was out of the house and that he would like to get rid of her," and that Jeneane was "in the way, [and] that she came between Oreste and Mary." R.T., May 26, 1994, at 142–43. Both of these statements are admissible under Rule 801(d)(2) as admissions by a party opponent.

¶ 52 We find the "get rid of her" statement, read in isolation, not so serious. A reasonable juror might assume from the statement that Defendant was unhappy that Jeneane was living with the couple and wanted her gone; but that juror might not find it was aggressively hostile or displayed murderous intent. Mary's statement that Defendant said to Jeneane, "I'll kill your fucking ass," displays aggression but also need not be interpreted as expressing murderous intent. Given that the statement was made after a police investigation of a spanking incident *two years earlier*, the jury might have found it was made out of sudden anger and did not reflect Defendant's intent two years later.

¶ 53 While the two admissible statements, taken together, certainly indicate dislike and perhaps aggressive hostility toward Jeneane,we cannot conclude beyond a reasonable doubt that a jury would find the statements carried the same weight as Jeneane's statements that she believed Defendant wanted to kill her. This prejudicial statement was admitted at trial not once, but twice, and argued by the prosecutor at closing.

¶ 54 Proof of Defendant's motive to kill Jeneane was a centerpiece of the state's case. Combined with other evidence, admissible testimony of several witnesses to Defendant's bad relationship with Jeneane was legally sufficient to show motive. While the evidence as a whole was sufficient to sustain a murder verdict, to sustain the charge of *premeditated* murder the prosecution must prove that Defendant "made a decision to kill prior to the act of killing." *State v. Kreps,* 146 Ariz. 446, 449, 706 P.2d 1213, 1216 (1985). The state made a thin case for murder, and an even thinner case for premeditated murder. No evidence was admitted at trial showing the circumstances surrounding the actual killing, whether Defendant committed the crime in a heat of passion or after reflective deliberation. Although no particular period of time is required for reflection, the statements "he's going to kill me" have the tendency to both forecast Defendant's conduct and support the inference that he deliberated such a plan, thus helping to prove premeditation. While a few other facts could support a finding of premeditation—*e.g.,* evidence that Defendant bought a new barrel for his gun the same day Jeneane disappeared—repetition of the "he's going to kill me" statements provides a strong inference that Defendant's conduct was planned, rather than the result of sudden anger without reflection, and strongly supports the otherwise thin evidence of premeditation. We cannot conclude beyond a reasonable doubt that the hearsay testimony did not affect the verdict of premeditated murder.

¶ 55 Furthermore, we recognize "that *repeated admission* of inadmissible matter may so strengthen the weight of the original admissible version that what would have been cumulative becomes conclusive and highly prejudicial." *State v. Williams,* 133 Ariz. 220, 227, 650 P.2d 1202, 1209 (1982) (emphasis added). A child's statements of fear of being killed by a parent are likely to evoke heightened sympathy and increase the likelihood of the jury believing the threat. Such statements exacerbate the effect of properly admitted evidence. It is impossible to conclude beyond a reasonable doubt that improper repetition of Jeneane's fear of being killed by her stepfather had no effect on the verdict when whether she was actually killed with premeditation by Defendant was the weakest issue in the case. Thus, we find the error prejudicial and must reverse.

### F. Whether the judge erred in admitting lead comparison evidence

¶ 56 Defendant argues that evidence comparing the lead fragments retrieved from Jeneane's head to the lead from the ammunition recovered from Defendant's home should have been excluded because the probative value was substantially outweighed by the prejudicial impact and potential to mislead and confuse the jury. *See* Rule 403, Ariz. R.Evid. Defendant contends the fact that fragments from Jeneane's head were of the same elemental composition as his ammunition was statistically irrelevant because there could have been as many as 40,000 boxes of such ammunition.

¶ 57 The test for relevance is whether the offered evidence tends to make the existence of any fact in issue more or less probable. *See* Rule 401; *State v. Oliver*, 158 Ariz. 22, 28, 760 P.2d 1071, 1077 (1988). The lead comparison evidence here was probative in that it tended to demonstrate that Defendant possessed ammunition consistent with that used to kill Jeneane. We do not see any prejudice that would substantially outweigh the probative value of the evidence to bar its admission. *See* Rule 403. The judge did not abuse her discretion in admitting this evidence.

### G. Whether the judge properly refused to exclude Defendant's ex-wife from the courtroom for the entire trial

¶ 58 Defendant claims his constitutional right to a fair trial was violated because the judge refused his request to exclude his ex-wife, Jeneane's mother, who was also a witness in the trial. Under the Arizona Rules of Criminal Procedure, the Arizona Rules of Evidence, and the Arizona Constitution, Jeneane's mother was properly permitted to be in the courtroom. Prior to the enactment of the Victims' Bill of Rights, both Arizona Criminal Rules 9.3 and 39, as well as Arizona Evidence Rule 615, gave a defendant the right to request exclusion of a witness. "[F]ailure to honor an exclusionary request is presumed prejudicial unless the absence of prejudice is clearly manifest from the record." *State v. Roberts*, 126 Ariz. 92, 94, 612 P.2d 1055, 1057 (1980). The Victims'

Bill of Rights, Ariz. Const. art. II, § 32.1, and the parallel provisions in Rule 39, however, excepted victims from the foregoing rules. The victim's mother is considered a victim in a homicide case. *See* Rule 39(a); A.R.S. § 13–4401(18).

¶ 59 While several states have a victims' bill of rights in their constitutions, few states have case law addressing whether altering, and in certain circumstances removing, a defendant's evidentiary or statutory right to exclude witnesses violates constitutional due process. In the few reported cases, however, the answer has been negative. "Inasmuch as the rule permitting the exclusion of witnesses originated with the legislature, we can conceive of no reason why the rule cannot be modified in the same manner. . . ." *Wheeler v. Maryland*, 88 Md. App. 512, 596 A.2d 78, 88 (1991) (quoting *Stephens v. Arkansas*, 290 Ark. 440, 720 S.W.2d 301 (1986)). We agree. Arizona's adoption of the Victims' Bill of Rights and the consequent statutory and rule changes implementing the constitutional provision effectively removed the presumption of prejudice that we traditionally attached to a trial judge's refusal to exclude a witness from the courtroom. Moreover, Defendant has not demonstrated any actual prejudice due to his ex-wife's presence prior to giving testimony. We therefore do not believe Defendant's due process rights were violated.

### H. Whether the probative value of testimony regarding the spanking incident was substantially outweighed by the prejudicial impact

¶ 60 Defendant challenges the testimony of Jeneane's mother about the incident in which Defendant spanked Jeneane and, after the police left, said to her, "I'll kill your fucking ass." Defendant acknowledges that in *Fulminante I*, we held this evidence admissible to show motive under Rule 404(b). 161 Ariz. at 247, 778 P.2d at 612. Defendant continues to challenge that ruling, and additionally challenges the evidence under Rule 403, arguing that prejudice outweighed its minimal relevance. The state contends the holding in the first appeal included an implicit consideration of Rule 403 and therefore is

the law of the case. We find no error, even if the defense preserved a new and valid Rule 403 objection. Defendant's statement, admissible as non-hearsay under Rule 801(d)(2), had probative value to demonstrate the hostile relationship between Jeneane and Defendant. We cannot say the prejudicial effect was so clearly unfair that we must find an abuse of the judge's discretion in admitting this evidence under Rule 403.

## I. Whether the judge abused her discretion in refusing to give a *Willits* instruction

¶ 61 The defense introduced evidence that Jeneane ate chicken and creamed corn around 6:30 the evening she disappeared. A pathologist testified that based on the contents of Jeneane's stomach, she died sometime within two hours of her last meal. He explained that under normal conditions, it takes about two hours for the gastric process to empty the stomach, and Jeneane's stomach had been full. Defendant told police he visited his wife in the hospital from 6:30 to 8:30 the evening of Jeneane's disappearance, although the timing of his visit was disputed. The autopsy revealed that Jeneane's stomach contents included meat. The state did not retain a sample of the contents. Defendant requested a *Willits* instruction on the grounds that had the state preserved a sample of Jeneane's stomach contents, the meat could have been determined to be chicken and a more exact time of death could have been established, perhaps during Defendant's visit to the hospital.

¶ 62 When police negligently fail to preserve potentially exculpatory evidence, an instruction pursuant to *State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964), permits the jury to infer that the evidence would have been exculpatory. To be entitled to a *Willits* instruction, a defendant must prove: (1) that the state failed to preserve material evidence that was accessible and might tend to exonerate him, and (2) resulting prejudice. *State v. Leslie*, 147 Ariz. 38, 47, 708 P.2d 719, 728 (1985). We review the refusal to give a *Willits* instruction for an abuse of discretion. *Id.* A trial court does not abuse its discretion by denying a request

for a *Willits* instruction when a defendant fails to establish that the lost evidence would have had a tendency to exonerate him. *State v. Bolton*, 182 Ariz. 290, 309, 896 P.2d 830, 849 (1995); *State v. Atwood*, 171 Ariz. 576, 627, 832 P.2d 593, 644 (1992).

¶ 63 Defendant would have benefitted little from the stomach contents being tested and identified conclusively as chicken. The jury had already heard that the stomach contents were meat and that Defendant told his wife he prepared chicken on the evening in question. All that Defendant could have gained from a precise determination of the stomach contents was certainty that Jeneane's last meal was chicken, rather than some other meat. The critical question, however, was not *what* Jeneane ate but *when* she ate. Even though Defendant claimed to police that he had been at the hospital from 6:30 to 8:15 p.m., the testimony of two other witnesses failed to support his assertion. The facts supporting Defendant's timing argument are highly questionable at best. We find, therefore, that the state's failure to preserve the evidence did not significantly prejudice Defendant. The trial judge did not abuse her discretion in refusing to give a *Willits* instruction.

## J. State's evidence of sexual misconduct

¶ 64 Defendant argues that the state's evidence of sexual misconduct violated his due process rights and that the probative value of such evidence was substantially outweighed by its prejudicial effect. The state contends that Defendant waived any specific objection to admission of the evidence because he failed to sufficiently object either during trial or by motion. An objection is sufficiently made if it provides the judge with an opportunity to provide a remedy. *See State v. Detrich*, 188 Ariz. 57, 64, 932 P.2d 1328, 1335 (1997). The objection may be made during the course of trial or by motion. *State v. Burton*, 144 Ariz. 248, 250, 697 P.2d 331, 333 (1985) ("[W]here a motion in limine is made and ruled upon, the objection raised in that motion is preserved for appeal, despite the absence of a specific objection at trial."). Errors not objected to will be reviewed only for fundamental error.

*State v. Willoughby,* 181 Ariz. 530, 546, 892 P.2d 1319, 1335 (1995).

### 1. Arrangement of Jeneane's pants and underpants

¶ 65  Defendant made no objection and did not file a motion in limine with respect to testimony on the arrangement of Jeneane's clothes. R.T., May 23, 1994, at 129–30. The state claims the evidence was relevant to show motive and to "complete the story" of the offense. *Cf. State v. Guerra,* 161 Ariz. 289, 292–93, 778 P.2d 1185, 1188–89 (1989). It is difficult to see the relevance of this evidence to the charges against Defendant or to ascertain just what story was being completed. But if it was error to admit this evidence, it certainly was not fundamental.

### 2. Swab testing

¶ 66  The state introduced testimony of the expert who tested swabs taken from Jeneane's mouth, vagina, and rectum. The expert testified that the test results were "moderately positive" but inconclusive, likely due to decomposition of the body, thus rendering the expert's final conclusion negative. Defendant asserted in his motion in limine that the foregoing evidence "is not relevant" and "is not probative, but is prejudicial and will mislead the jury." Thus, objections based on Rules 401 and 403 are properly before this court.

¶ 67  Rule 401 states that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The state's swab testing testimony did not meet the minimum requirements of relevance. Defendant was not charged with sexual assault; nor was there any evidence that he ever had a sexual relationship with Jeneane or made any sexual advances toward her. If, as the state contends, the evidence shows motive, there is no evidence connecting that motive to Defendant. Further, any minimally probative value of this evidence was substantially outweighed by its prejudicial effect. The examination of the state's expert who conducted the test strongly suggested that the findings were not reliable enough to confirm there had been a sexual assault. If the state's expert was forthright enough to say that the findings were so inconclusive he had to reach a negative conclusion, then admitting the evidence so that the jury could reach a different conclusion merely invited the jury to speculate and posed a serious threat of misleading. The testimony thus permitted the jury to decide "on an improper basis, such as emotion, sympathy, or horror." *See State v. Mott,* 187 Ariz. 536, 545, 931 P.2d 1046, 1055 (1997); *see also Bennett v. PRC Public Sector, Inc.,* 931 F.Supp. 484, 502–03 (S.D.Tex.1996) (holding that conclusions based on unreliable evidence have substantial prejudicial effect).

¶ 68  The judge should have excluded the testimony. But because we reverse on other grounds, we need not engage in a harmless error analysis. Unless the state can establish affirmative evidence of sexual assault and somehow connect it to Defendant, the evidence should not be admitted on retrial.

## CONCLUSION

¶ 69  Finding error as described in this opinion, we reverse Defendant's conviction and sentence. Concluding there was sufficient evidence to take the case to the jury, we remand to the trial court for retrial and proceedings consistent with this opinion.

THOMAS A. ZLAKET, Chief Justice, CHARLES E. JONES, Vice Chief Justice, and FREDERICK J. MARTONE and RUTH V. McGREGOR, Justices, concurring.