25 P.3d 1139

STATE of Arizona, Appellee,

v.

Timothy Stuart RING, Appellant.

No. CR–97–0428–AP.

Supreme Court of Arizona,
En Banc.

June 20, 2001.

Janet A. Napolitano, Arizona Attorney General, by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Jon G. Anderson, Assistant Attorney General, Phoenix, Attorneys for the State of Arizona.

Robert W. Doyle, Phoenix, and Kerrie Droban, Cave Creek, Attorneys for Timothy Stuart Ring.

## OPINION.

FELDMAN, Justice.

¶ 1 On December 6, 1996, a jury found Defendant, Timothy Stuart Ring, guilty of first-degree murder, conspiracy to commit armed robbery, armed robbery, burglary, and theft. Defendant was sentenced to terms of imprisonment for the robbery, burglary, theft, and conspiracy convictions. Because the trial judge sentenced Defendant to death for the murder, direct appeal to this court is automatic. A.R.S. § 13–703.01. We have jurisdiction pursuant to Arizona Constitution article VI, § 5.3, A.R.S. § 13–4031, and Arizona Rules of Criminal Procedure 31.2.b.

## FACTS AND PROCEDURAL HISTORY

¶ 2 At approximately 2:00 p.m. on November 28, 1994, a Wells Fargo armored van servicing Dillard's department store at Arrowhead Mall was reported missing by Dave Moss, the van's "hopper."[1] At approximately 6:30 p.m. that same day, a Maricopa County Sheriff's deputy discovered the missing van in the parking lot of a Sun City church. All of the van's doors were locked, the engine was running, and a body was slumped over on the passenger side. The body was that of the van's driver, John Magoch, who had been killed by a gunshot wound to the head.

¶ 3 Wells Fargo determined that its losses from the robbery totaled $833,798.12, of which $562,877.91 was in cash. Although no eyewitnesses to the crime came forward, one person riding his bicycle in Sun City on the afternoon of the robbery claimed to have seen a white van, followed by a red pick-up truck, run a stop sign. This witness stated that one man was driving the red truck while two people were in the van. Another witness also saw a white van followed by a red pick-up truck. Although she remembered one man driving the van, she testified that either two or three men were in the red truck.

¶ 4 Through information provided by an informant, the Glendale Police Department contacted Judy Espinoza, who believed that her boyfriend James Greenham and a friend of Greenham's named "Tim" may have been involved in the robbery. "Tim" later turned out to be Defendant—Timothy Ring. Glendale Police interviewed Espinoza on December 30, 1994. Espinoza stated that when she heard about the robbery on the radio, she remembered that a week before Greenham had asked her what she would do "if he hit an Armored car." State's Exhibit # 33, at 2. Espinoza also remembered that, although Greenham had been staying with her, he was

---

1. "Hopper" is the slang term for a street messenger, which is the armored-car employee who enters businesses to collect/deliver money while the driver stays inside the armored vehicle.

not at home on the night of the robbery and during that week he was "very stressed out." *Id.* at 3. In addition, shortly after the robbery, Greenham handed Espinoza a bag of rolled coins totaling approximately $250 and gave Espinoza's mother $800 in cash to pay bills. Finally, Espinoza informed the police that Greenham's friend Tim owned a red truck. About a week before the interview with police, Greenham had stopped dating Espinoza and had moved out of her home.

¶5 While conducting surveillance of Greenham, the police noticed that he appeared to be riding a new motorcycle. Random phone calls to motorcycle dealerships revealed that, in December 1994, Greenham and Defendant made large cash purchases at Metro Motor Sports. Specifically, Defendant bought two ATVs and a motorcycle from the dealership for $7,500 and $7,300, respectively. Over the next several weeks, Defendant and Greenham both made many more expensive purchases, all of them cash transactions. Wiretaps on certain telephones belonging to Defendant and Greenham began on January 9, 1995. On January 21, 1995, Defendant called William Ferguson and discussed Greenham's purchase of a new truck, the trouble this caused with Greenham's ex-wife, and what impact that trouble might have on their plans "up north." State's Exhibit #49A, at 11. In that call, Defendant threatened to "cut off" Greenham's supply, as Defendant held "both his and mine." *Id.* The two also talked about disappearing for two years after "up north happens," then reuniting in Las Vegas. *Id.* at 14. Four days later, Ferguson bought a new motorcycle for $8,700 cash, paying in fifty and one-hundred dollar bills.

¶6 On January 26, 1995, Greenham called Defendant's pager and entered the following code: 20*2000*04. He followed that call with another code: 50*5000*04. In conversations between Defendant and Ferguson, Defendant had referred to Greenham as "zero four." Later that day, Defendant asked Greenham, "The two pages you sent . . . those are your requests, is that right?" To which Greenham responded, "Yeah." State's Exhibit #52A.

¶7 As part of the investigation of Defendant, arrangements were made with Waste Management Company to perform a "trash cover," enabling investigators to sort through and survey Defendant's waste. During this process, police acquired two notecards, written by Defendant, with addresses of businesses serviced by Loomis Armored Cars, as well as numbers corresponding to Loomis trucks. Defendant was employed by Loomis in 1988–89 and, at trial, claimed that the notecards pertained to his employment at that time.

¶8 The police then attempted to generate discussion between the conspirators about the robbery. On January 31, 1995, the police issued a news release that was aired on local television stations. Defendant called Greenham at approximately 10:30 that evening and left a message on Greenham's answering machine to "remind me to talk to you tomorrow and tell you what was on the news tonight. Very important, and also fairly good." State's Exhibit #55A. A few days later, Detective Tom Clayton from the Glendale Police Department left his business card on the door of Greenham's residence, requesting that Greenham call and "refer to lead 176." In response, Greenham made an emotional, panicked telephone call to Defendant. Greenham also apparently called his ex-wife, who was so concerned about his well-being that she asked Phoenix Police to visit Greenham's apartment to check on him. Coincidentally, Defendant stopped by Greenham's apartment at the same time. Defendant later discussed this incident with Ferguson, telling him "I don't know what to think of it. Uhm, his house is clean. Mine, on the other hand, contains a very large bag." State's Exhibit #70A, at 7. Later that same day, Defendant also said, "it doesn't really make a whole lot of sense, because given the information that they do have, both public and what I've been able to ascertain privately . . . if they were gonna come after somebody, it would be me." State's Exhibit #71A, at 10–11. Ferguson ended the call by saying that he would "keep a suitcase packed." *Id.* at 17.

¶9 On February 14, 1995, the police again attempted to generate conversation by airing

a "Silent Witness" re-enactment on the local news that contained several deliberately incorrect details about the robbery and murder. Defendant called Ferguson at 10:51 p.m. to talk about the broadcast. Ferguson claimed to have "laughed my ass off" and said he was "not real worried at all now." State's Exhibit # 80A, at 3. Defendant stated that "there's only one thing that slightly concerns me," and asked, "What if push comes to shove down the months and they ask for hair and fibers, so forth, and it happens to somehow...." *Id.* at 4. Later in the conversation, Defendant said, "there was a couple of in continuities (sic) to their story.... They showed a suppressed revolver of all things." *Id.* at 25.

¶ 10 Two days later, on February 16, 1995, a search warrant was served on Defendant's residence. Police found a homemade sound suppressor attached to a Ruger 1022 rifle[2] barrel behind the hot water heater in a corner of Defendant's garage. Also in the garage, inside a storage cabinet, police discovered a green duffel bag with Defendant's name on it. The bag contained bundles of United States currency totaling $271,681. Defendant also had $1,040 in a headboard in the master bedroom. In a notebook found in the same headboard, police discovered a post-it note that had the number "575,995" on it. Below the number was the word "splits," with the three letters "F," "Y," and "T," and numbers below the letters totaling 575,995, which is remarkably similar to the total cash amount taken in the robbery. An expert testified that this note was written by Defendant. Greenham's friends often called him "Yoda"; thus, argued the state, the "Y" represented Greenham, the "F" was for Ferguson, and the "T" stood for Defendant. A search warrant served on Ferguson's residence also turned up $62,601. Approximately $200 was found at Greenham's apartment.

¶ 11 In his own defense, Defendant claimed to have made more than $100,000 as a confidential informant for the FBI. However, an agent for that agency testified that Defendant was only paid a total of $458. In addition, Defendant testified that his income included money made as a bounty hunter and gunsmith. However, Defendant only made $3,500 working for Don's Bail Bonds in 1993 and while working one month for A–1 Bail Bonds in 1994 was paid $1,600.

¶ 12 Based on this circumstantial evidence, a jury found Defendant guilty of felony murder for killing John Magoch. As required by statute, the trial judge conducted a special sentencing hearing. A.R.S. § 13–703.B. Under the Arizona system, this hearing is conducted without a jury—the judge makes the factual findings that determine whether the defendant is to be sentenced to life imprisonment or death. *Id.* Pursuant to a plea bargain[3] arranged after Defendant's jury verdict was received, Greenham testified at the sentencing hearing. Greenham admitted that he, Ferguson, and Defendant planned and executed the robbery. Greenham also testified that Defendant was the "leader because he laid out all the tactics," that Defendant shot the driver with a "Ruger ... twenty-two rifle," and that, the day after the shooting, Defendant wanted to be "congratulate[d]" on his "shot." Reporter's Transcript ("R.T."), October 19, 1997, at 39, 44–45, 60.

¶ 13 In his special verdict, the trial judge found that Defendant "is the one who killed Mr. Magoch." Special Verdict, filed October 29, 1997, at 2. In addition, the judge determined that Defendant "was a major participant in the armed robbery of Mr. Magoch that resulted in him being killed and that the Defendant's conduct exhibited a reckless disregard for human life." *Id.* Finding the statutory aggravating circumstances of A.R.S. § 13–703.F.5 and 6 present, the judge stated that Defendant committed the offense "in expectation of the receipt of anything of pecuniary value" and "in an especially heinous, cruel or depraved manner." *Id.* at 3. These findings made Defendant eligible for a death

---

2. At trial, however, the state was unable to connect this weapon to the crime. The bullet that killed Magoch was not recovered, and the pathologist who performed the autopsy could not testify conclusively as to the type of weapon or caliber of bullet that caused Magoch's lethal wound.

3. Greenham pled guilty to second-degree murder and two counts of armed robbery. At the time of the hearing, Greenham had yet to be sentenced, but expected to be imprisoned for 27.5 years.

sentence. A.R.S. § 13–703.F.5 & 6. While not finding the existence of any enumerated mitigating factors, the judge did acknowledge that Defendant's "minimal criminal record" was a mitigating factor. The judge then determined that the mitigating evidence, when weighed against the aggravating evidence, was insufficient to call for leniency and sentenced Defendant to death for the murder.

## DISCUSSION

### A. Trial issues

#### 1. Suppression of wiretap evidence

¶ 14 The collection of wiretap evidence is governed by A.R.S. §§ 13–3001—13–3019. Defendant argues that, because normal investigative techniques were not exhausted, the affidavit supporting the necessity for electronic surveillance was deficient. In addition, Defendant claims that minimization requirements were not met. Thus, according to Defendant, the trial judge abused his discretion by not granting his motion to suppress. We review the denial of a motion to suppress for an abuse of discretion. *State v. Atwood,* 171 Ariz. 576, 603, 832 P.2d 593, 620 (1992).

#### a. Necessity

¶ 15 To satisfy the necessity requirement, an affidavit must state facts from which the judge may conclude that traditional methods have been tried and failed or are unlikely to succeed. A.R.S. § 13–3010.C.3; *State v. Hale,* 131 Ariz. 444, 447, 641 P.2d 1288, 1291 (1982). Conclusory statements or boilerplate recitations of difficulties inherent in any investigation do not satisfy the necessity requirement. *Id.* at 447, 641 P.2d at 1291. An affidavit in support of a wiretap order should be evaluated "in a commonsense and realistic, rather than a hypertechnical, manner." *Id.* at 446, 641 P.2d at 1230. The necessity requirement also "is to be interpreted in a commonsense fashion with an eye toward the practicalities of investigative work." *Id.* at 447, 641 P.2d at 1231. Wiretaps should neither be "routinely used as the first step in criminal investigations" nor issued "in situations where conventional investigative techniques would be adequate to uncover the crime." *Id.* However, a wiretap does not have to be used "only as a last resort." *Id.*

¶ 16 Defendant claims that the state failed to exhaust normal investigative techniques before seeking electronic surveillance. Specifically, Defendant asserts that the state did not attempt to use undercover operations, informants, surveillance, or trash searches. While it is theoretically possible that other investigative techniques may have been successful, not all surveillance strategies must be exhausted before a wiretap application is appropriately granted. *State v. Politte,* 136 Ariz. 117, 129, 664 P.2d 661, 673 (App.1982).

#### (1) The affidavit

¶ 17 Applying the foregoing principles to this case, we note first that when presenting the affidavit, the state submitted a detailed explanation of how other investigative procedures "have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ." Affidavit in Support of Application for Interception, January 8, 1995, at 17. As for surveillance, not only was it unsuccessful when used to monitor the activities of co-conspirator Greenham (who drove erratically and appeared to be watching for following vehicles) but, the affidavit alleged, the effectiveness of surveillance as an investigative tool would be limited because it "can only confirm meetings of people" and "does not provide the physical/verbal evidence needed for prosecution of the case." *Id.* at 8. According to the affidavit, the use of informants would be unsuccessful because "[b]oth Ring and Greenham are very selective on who they deal with and both are known to be 'street smart' and will not openly discuss aspects of the case." *Id.* The only possible informant, Judy Espinoza, no longer had contact with Greenham and had resisted Defendant's attempts to contact her out of fear that she would be killed if it was suspected or discovered that she was providing information to the police. The state also felt that, because of Defendant's habit of carrying a firearm, it would be dangerous to attempt to introduce an informant.

¶ 18 The affidavit went on to state that, although considered, undercover operations were rejected because of Defendant's prior training as a police officer, familiarity with undercover operations, and current contacts with law enforcement agencies. Pen registers, which trap and trace the numbers dialed and received from certain telecommunications equipment, were employed to gather evidence against Defendant. But, like surveillance, their effectiveness was limited, as they simply established that contacts were made without revealing the content of the communications. A grand jury investigation was ruled out because it would likely not provide sufficient evidence to support a successful prosecution, would necessitate granting immunity to one of the co-conspirators, and would perhaps allow co-conspirators to flee the state, retaliate against witnesses, or destroy potential evidence.

¶ 19 Although the state conceded that probable cause for a search warrant of Defendant's home existed at the time of the wiretap application, its affidavit alleged that not all co-conspirators had been identified; locations of much of the evidence also had not been deduced. In addition, execution of a search warrant would have prematurely alerted other conspirators and, because the stolen money had not been marked, it was believed that any money recovered would not be able to be conclusively traced to the robbery. The affidavit noted that all of the "very little physical evidence" collected at the crime scene, as well as leads procured from potential witnesses, had been exhausted. Interviewing Defendant or Greenham was discounted as it would alert them to their status as suspects and provide them time to conceal and destroy evidence, give them reason to flee, or allow them to retaliate against witnesses.

¶ 20 As demonstrated by these numerous and detailed facts, the affidavit in this case fully complied with the necessity requirement. The order authorizing the wiretap was therefore proper.

### (2) Hearing on motion to suppress

¶ 21 At the hearing on Defendant's motion to suppress the wiretap evidence, Defendant also argued that it was unreasonable to allow the wiretap until trash covers were completed and the use of informants had failed. Defendant even offered the following people as possible infiltrators: 1) Judy Espinoza, an ex-girlfriend of Greenham and the person who initially implicated Defendant; 2) Michael Sanders, an acquaintance of Defendant and a possible suspect in the robbery; 3) Brian Robbins, who had previously participated in another armed robbery with Defendant, Greenham, and Sanders; and 4) James Gonzales, a former associate of Defendant in his bounty-hunting enterprise.

¶ 22 When ruling against the motion, the trial judge addressed each of these arguments specifically. He found a trash cover to be "a risky venture with little probability of success." Minute Entry ("M.E."), October 18, 1996, at 3. The judge found that Espinoza was an "unreasonable" option because she "was afraid of [Defendant] and had effectively cut off all ties with both [Defendant] and Greenham." Id. at 2. The judge considered Sanders to be similarly unsuitable because he was on federal probation, had prior felony convictions, demanded a weapon if he met with Defendant, and told police he would, if he perceived danger, "take out" Defendant with a "preemptive strike." Id. The judge also found Defendant's arguments regarding Robbins and Gonzales "equally unconvincing." Id. at 3. Robbins could not pass a polygraph examination and asked for immunity for another armed robbery. Gonzales had been "kicked out of the group" months before and had not been in contact with Defendant since that time. Id.

¶ 23 Based on these well-articulated reasons, and considering the detail of the affidavit, the judge did not abuse his discretion in denying Defendant's motion to suppress on necessity grounds.

### b. Minimization

¶ 24 Our statute requires that wiretaps be "conducted in such a way as to minimize interception of communications not otherwise subject to interception." A.R.S. § 13–3010.D.6. In determining whether monitoring agents comply with these minimization requirements, Arizona has followed the stan-

dard articulated in *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). *State v. Olea,* 139 Ariz. 280, 285, 678 P.2d 465, 470 (App.1983). That standard requires an "objective assessment of the reasonableness of the monitoring agents' actions in light of all of the facts and circumstances confronting them at the time." *Id.* According to *Olea,* the following three factors should be considered in determining the objective reasonableness of the minimization attempt: 1) the investigation's nature and scope, 2) the government's reasonable expectations of the conversations' character, and 3) the extent of judicial supervision over the surveillance. *Id.*

¶ 25 Here, the wiretaps were instituted with the intent of uncovering the scope of the conspiracy, more specific details about the crime, and the location of valuable, as-yet-to-be-discovered evidence, as well as preventing furtherance of the conspiracy and identifying the third conspirator. The request was based on expectations that "persons involved in a criminal conspiracy use telephones" toward such ends and that one potential informant had already heard Defendant "use the phone to talk about the incident." Affidavit in Support of Application for Interception, January 8, 1995, at 22–23. A detailed "Wire Interception Minimization Guidelines" was read and signed by every agent involved in the monitoring. These guidelines gave specific instructions to the monitoring agents on how to legally perform their duties, including when to terminate calls that could possibly fall under a privilege. Approximately every ten days the officers in charge of minimization submitted detailed, extensive reports to the judge who issued both the initial and continuing orders for communication interceptions. These reports detailed the number of calls intercepted, with a summary of the times and types of calls intercepted, as well as any malfunctions or other problems encountered. The reports also detailed both the evidence acquired and what was still being sought. In addition, the reports articulated the reasons for continued interception.

¶ 26 The facts establish careful investigative work. Although Defendant cites a few specific instances of non-minimization

to support his claim that this case constitutes a significant violation of the minimization requirements, we must look to the totality of the circumstances to determine the reasonableness of the state's minimization attempts. *Olea,* 139 Ariz. at 285, 678 P.2d at 470. After analyzing the objective reasonableness of the monitor's actions within the context of the facts of this case, we agree with the trial judge when he stated:

> The contention that all the wiretaps must be suppressed because the monitors did not adequately minimize interception of the calls is without merit. The overwhelming number of calls were very short thus precluding any minimization. Additionally, the members of this group consistently jumped from topic to topic during their conversations. Moreover, the extent of the organization, and the possible involvement of others such as [Defendant's] wife, greatly hampered any reasonable and consistent effort to minimize interception of phone calls. Finally, under all of the circumstances, the police exercised reasonable efforts to minimize interception of non-relevant or privileged calls.

M.E., October 18, 1996, at 4. We conclude that the judge did not abuse his discretion in denying Defendant's motion to suppress.

**2. Third-party defense evidence**

¶ 27 Defendant argues that the trial judge's rulings prohibiting the introduction of evidence that a third party, Michael Sanders, committed the crime were errors requiring reversal. Again, we review the trial judge's decisions for abuse of discretion. *State v. Tankersley,* 191 Ariz. 359, 369 ¶ 37, 956 P.2d 486, 496 ¶ 37 (1998).

¶ 28 Although a defendant may introduce evidence that shows that another person committed the crime for which the defendant is charged, the trial judge may exclude such evidence if it "simply affords a possible ground of suspicion against another." *Id.* at ¶ 38 (quoting *State v. Oliver,* 169 Ariz. 589, 590, 821 P.2d 250, 251 (App.1991)). For third-party defense evidence to be admitted at trial, the defendant must demonstrate that the evidence has an "inherent tendency" to connect the third party to the

"actual commission" of the crime. *Id.; see also State v. Fulminante,* 161 Ariz. 237, 252, 778 P.2d 602, 617 (1988).

¶ 29 Before trial, the state filed a motion to preclude Defendant from introducing evidence that anyone other than Defendant, Greenham, and Ferguson committed the charged crimes. Defendant's response challenged the motion as being "overly broad," "burdensome," and "highly prejudicial" to Defendant because granting the motion "would leave Defendant without a defense." Defendant's Response to State's Motion to Preclude Third Party 404(B) Evidence and Defense, filed July 25, 1996, at 4, 8–9. Defendant then filed a supplement to his response, including an offer of proof, in which he asserted that evidence existed that other persons not named as defendants participated in and/or committed the alleged criminal offenses. Specifically, Defendant claimed that Sanders "precisely described" the manner in which the robbery and murder were committed, was an hour late to work on the day of the crimes, met with a detective from the Glendale Police Department seeking immunity from both the present and additional crimes in exchange for information, admitted that he would have "no problem" killing someone under the "right" circumstances, and was a convicted felon with a prior violent criminal history. In addition, Defendant asserted that the police maintained surveillance of Sanders for the specific purpose of determining the extent of Sanders' involvement in the crimes even after Defendant and his co-conspirators were arrested.

¶ 30 After taking the motion under advisement, the trial judge granted the state's request to preclude evidence that Sanders committed the crime. The judge noted that "the evidence shows Sanders may have been involved in the planning of the armed robbery. However, the evidence does not have an inherent tendency to *connect* Sanders with the commission of the offense." M.E., October 18, 1996, at 10. In addition, the judge stated that "[w]ithout more specifics, it is difficult to determine what evidence [Defendant] wishes to present." *Id.*

¶ 31 While cross-examining one of the state's witnesses, Defendant asked the witness whether he was "personally familiar" with Michael Sanders. The state objected and, out of the presence of the jury, Defendant stated that "as long as the defense can make the nexus," he was allowed to "go into that area." R.T., November 19, 1996, at 84. Defendant was apparently attempting to elicit evidence that a witness remembered seeing a man who resembled Sanders in the vicinity of the van two route stops before the scene of the crime. The trial judge reminded Defendant that he must "prove the connection" between Sanders and either the planning or commission of the crimes, as well as present it to the court "out of the presence of the jury," before he would allow the evidence to be admitted. Pressed by Defendant, the judge described the type of necessary "nexus" as follows:

> If [Defendant can] show that [Sanders] participated in the planning and talk about the robbery and then you have, you have what is arguably his identification at the scene, or as the cars are being driven away, I said I think in my mind, that may be enough to prove the connection, or the nexus for you to pursue the defense and to argue it to that jury.

*Id.* at 94. Defendant did not attempt to assert the third-party defense again during the remainder of the trial.

¶ 32 Arguably, Defendant's evidence regarding Sanders was relevant to establish that Sanders was involved in the planning of the crimes. But while the evidence Defendant claims he may have produced about Sanders might implicate Sanders as a participant in the planning of the crimes, it would not have exculpated Defendant for his role in both planning and committing the crimes. Based on this important distinction, there was no abuse in the trial judge's decision to reject the third-party defense evidence. Because implicating Sanders would not tend to exculpate Defendant, we conclude that even if it was error to preclude the evidence regarding Sanders, the error did not, beyond a reasonable doubt, contribute to or affect the verdict. *State v. Fulminante,* 193 Ariz. 485, 500 ¶ 49, 975 P.2d 75, 90 ¶ 49 (1999). Therefore, given the facts of this case, any error is harmless. *Id.*

### 3. New trial motion

¶ 33 Defendant claims that the trial judge abused his discretion when he denied Defendant's new trial motion. Defendant specifically argues that a new trial should have been granted based on the FBI's failure to provide Defendant's entire FBI file and the state's failure to disclose both a witness' pre-hypnotic videotape testimony and evidence supporting Defendant's third-party defense. Only the first of these three issues was raised in Defendant's *timely* new trial motion. Ariz.R.Crim. P. 24.1.b ("A motion for new trial shall be made no later than 10 days after the verdict has been rendered."). Several claims, including the other two issues argued by Defendant here, were raised in subsequent *untimely* new trial motions.[4] The trial court has no jurisdiction to grant a new trial motion if it is not made within ten days after the verdict. *State v. Hickle,* 129 Ariz. 330, 332, 631 P.2d 112, 114 (1981). Because the trial judge did not have jurisdiction to consider Defendant's claims raised in an untimely new trial motion, those redundant claims will not be addressed by this court on appeal. Of course, Defendant can raise these claims in post-conviction relief proceedings pursuant to Ariz.R.Crim.P. 32.1 *et seq. See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Therefore, only the first issue needs to be examined: Whether the trial judge should have granted a new trial based on the fact that Defendant did not receive his entire FBI file.

¶ 34 In making this argument, Defendant relies on Ariz.R.Crim.P. 24.1.C.5, which states that the trial judge may grant a new trial when "[f]or any other reason not due to the defendant's own fault the defendant has not received a fair and impartial trial." Defendant claims that, without the entire file, he was unable to support his claim that the money found in his home was compensation for his work as an FBI informant or to refute the trial testimony of an FBI agent that Defendant was never paid substantial amounts of money as an informant.

¶ 35 Defendant bases his argument on a discrepancy between the size of the file forwarded to him before trial from the FBI, which was approximately 20–25 pages, and trial testimony from an FBI agent that Defendant's file is "about two inches thick." R.T., October 9, 1997, at 5; R.T., December 4, 1996, at 36. First, we must recognize that the FBI agent may have inadvertently misstated or simply overestimated the size of Defendant's file. If, however, Defendant is correct about the actual size of his file, then he has failed to demonstrate that his receipt of only a portion of his FBI file was due to anyone's fault but his own. Upon receipt of what was to Defendant an obviously incomplete file (which Defendant would have realized when information about the activities he claims should have been in the file was discovered missing), Defendant should have acted to procure the entire file. Instead, Defendant apparently waited until trial and used the alleged discrepancy to argue that the FBI was unwilling to proffer the entire file as part of a more general cover-up or conspiracy theory. Unsuccessful with that argument, Defendant waited until filing a new trial motion to complain that, based on no fault of his own, he did not receive the entire FBI file and the incomplete disclosure precluded him from properly procuring a defense. Based on this reasoning, Defendant has not satisfied the necessary requirement that he have no responsibility in the alleged trial taint. *See* Ariz.R.Crim.P. 24.1.C.5. In addition, trial testimony demonstrated that it would be unlikely that the FBI file would corroborate Defendant's claims.[5]

---

4. The verdicts in Defendant's case were rendered on December 6, 1996. Defendant timely filed a new trial motion by December 16, 1996. Almost a year later, on September 15, 1997, Defendant filed a "supplemental" motion for new trial. Both the next day, and two days after that, Defendant again filed supplemental new trial motions. Labeling untimely motions as supplemental does not enable a party to avoid the time restrictions imposed by procedural rules—especially those rules, such as Ariz.R.Crim.P. 24.1.b, that confer jurisdiction on the trial court. *State v. Hickle,* 129 Ariz. 330, 332, 631 P.2d 112, 114 (1981).

5. Our disposition of this issue does not preclude Defendant from raising it as a *Brady* claim in post-conviction relief proceedings pursuant to Ariz.R.Crim.P. 32.1. *See supra* ¶ 33.

¶ 36 At trial, Agent Michael Fain of the FBI's Phoenix office testified that the total amount given to Defendant for his services as an informant was $485. Fain also testified that he was the only individual, and the Phoenix office the only office, to have "administrative control" of any informant operating in the Phoenix area. R.T., November 20, 1996, at 47. Thus, according to Fain's testimony, no other FBI agent would have paid Defendant to work as an informant.

¶ 37 Defendant later took the stand and controverted Fain's testimony. Defendant claimed that he performed many services for the FBI and was paid "a total of about a hundred and five thousand dollars," all of which was paid in cash. R.T., December 12, 1996, at 162. On cross-examination, Defendant stated that "the majority of the income" he made from the FBI, including the $105,000, was not paid through Agent Fain but by an Agent Dan Steel. Defendant claimed to have been paid $35,000, $45,000, and $25,000 by Agent Steel for three separate assignments in Mexico. Although many of Defendant's prior, documented meetings with the FBI included the presence of other persons, Defendant claimed to have completed his Mexico assignments with anonymous contacts and to have always met with Agent Steel alone.

¶ 38 To rebut this testimony the state called Special Agent Mark Tanner, an assistant special agent in charge of Phoenix. Tanner described the process implemented to pay informants, which included issuing checks to agents (who in turn cash the checks and pay the informants in cash), returning receipts for payment, and acquiring permission from headquarters for any amount in excess of $20,000. Tanner testified that it would not be possible for an agent to get money without following the procedure. Tanner also denied that Defendant was ever paid in excess of $20,000. Finally, Tanner told the jury that he had never known an Agent Dan Steel, that an agent with that name did not work in the Phoenix division, and, to his knowledge, no agent by that name had ever visited Phoenix.

¶ 39 Defendant's alleged inability to access his entire FBI file did not render his trial so unfair as to require the granting of a new trial. Therefore, the trial judge did not abuse his discretion in denying Defendant's new trial motion.

## B. Sentencing issues

### 1. Constitutional challenge

¶ 40 Defendant argues that, in light of the United States Supreme Court's decisions in *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), and *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), Arizona's capital sentencing scheme violates the Sixth and Fourteenth Amendments to the United States Constitution. In response to Defendant's claims, the state counters that *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), which approved Arizona's present judge-sentencing procedure for capital cases, is still the controlling authority on point. While the state is correct in noting that neither *Jones* nor *Apprendi* overruled *Walton,* we must acknowledge that both cases raise some question about the continued viability of *Walton.* Of course, it could also be said that because a majority of the Court refused to expressly overrule *Walton,* the apparent scope of *Apprendi* and *Jones* is not as broad as some of the language of the two opinions suggests. The unclear language of the Court's *Apprendi* and *Jones* opinions makes either of these interpretations reasonable and, therefore, we believe the practical operation of Arizona's death penalty scheme, as applied under the peculiar facts of the present case, requires some further explication.

¶ 41 The background is this: While upholding a federal carjacking statute, the *Jones* Court reasoned that "diminishment of the jury's significance by removing control over facts determining a statutory sentencing range" would violate the Sixth Amendment. 526 U.S. at 248, 119 S.Ct. at 1226. *Apprendi,* a case involving the charge of unlawful possession of a firearm, presented the question of whether proof of a so-called hate crime motive was a sentencing factor or an element of the crime. 530 U.S. at 471, 120 S.Ct. at 2352. In *Apprendi,* the majority held, "Oth-

er than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. at 2362–63. The majority, citing *Walton,* went on to reject the argument that *Apprendi* might jeopardize a capital sentencing scheme like Arizona's by describing such a scheme as a system that merely "requir[es] judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death," and not as a system that "permits a judge to determine the existence of a factor which makes a crime a capital offense." *Id.* at 496–97, 120 S.Ct. at 2366 (internal citation omitted). In dissent, Justice O'Connor challenged the majority's rationale as follows:

> The distinction of *Walton* offered by the Court today is baffling, to say the least. The key to that distinction is the Court's claim that, in Arizona, the jury makes all of the findings necessary to expose the defendant to a death sentence. As explained above, that claim is demonstrably untrue. A defendant convicted of first-degree murder in Arizona cannot receive a death sentence unless a judge makes the factual determination that a statutory aggravating factor exists. Without that critical finding, the maximum sentence to which the defendant is exposed is life imprisonment, and not the death penalty. .... If the Court does not intend to overrule *Walton,* one would be hard pressed to tell from the opinion it issues today.

*Id.* at 538, 120 S.Ct. at 2388 (citations and internal quotations omitted).

¶ 42 In Arizona, a defendant cannot be put to death solely on the basis of a jury's verdict, regardless of the jury's factual findings. The range of punishment allowed by law on the basis of the verdict alone is life imprisonment with the possibility of parole or imprisonment for "natural life" without the possibility of release. A.R.S. § 13–703.A E. It is only after a subsequent adversarial sentencing hearing, at which the judge alone acts as the finder of the necessary statutory factual elements, that a defendant may be sentenced to death. A.R.S. § 13–703.B ("The hearing shall be conducted before the court alone. The court alone shall make all factual determinations required by this section or the constitution of the United States or this state."). And even then a death sentence may not legally be imposed by the trial judge unless at least one aggravating factor is found to exist beyond a reasonable doubt. *State v. Gretzler,* 135 Ariz. 42, 54, 659 P.2d 1, 13 (1983); *see also* A.R.S. § 13–703.E ("the court . . . shall impose a sentence of death if the court finds one or more of the aggravating circumstances enumerated"). Thus, when the state seeks the death penalty, a separate evidentiary hearing, without a jury, must be held; the death sentence becomes possible only after the trial judge makes a factual finding that at least one aggravating factor is present. The judge makes that finding on the basis of the evidence presented at trial and any other evidence presented at the aggravation/mitigation hearing. A.R.S. § 13–703.C. If the judge finds an aggravating circumstance, he must then proceed to determine if there are any mitigating circumstances. A.R.S. § 13–703.E. If the judge finds mitigating circumstances, he must then weigh them against the aggravators and decide by "special verdict" whether a death sentence is appropriate. A.R.S. § 13–703.D & E.

¶ 43 Therefore, the present case is precisely as described in Justice O'Connor's dissent—Defendant's death sentence required the judge's factual findings. Specifically, the trial judge in this case made the necessary factual finding to support the aggravating circumstance that the killing was heinous and depraved. *See* A.R.S. § 13–703.F.6. That finding was based solely on Greenham's testimony at the separate sentencing hearing and was never heard by the jury.

¶ 44 We recognize that the United States Supreme Court has explicitly refrained from overruling *Walton. See, e.g., Apprendi,* 530 U.S. at 496, 120 S.Ct. at 2366 ("[T]his Court has previously considered and rejected the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating

factors before imposing a sentence of death.") (citing *Walton*, 497 U.S. at 647–49, 110 S.Ct. at 3054–55); *Jones*, 526 U.S. at 250, 119 S.Ct. at 1228. Although Defendant argues that *Walton* cannot stand after *Apprendi*, we are bound by the Supremacy Clause in such matters. Thus, we must conclude that *Walton* is still the controlling authority and that the Arizona death-penalty scheme has not been held unconstitutional under either *Apprendi* or *Jones*. Putting aside Defendant's constitutional challenge to Arizona's death penalty scheme, we turn to the other sentencing issues he raises.

### 2. Actual killer/*Enmund-Tison* finding

¶ 45 Defendant claims that the trial judge erred in finding that Defendant killed Magoch because the "sole proof" supporting such a finding was the testimony of Greenham, a person who lacked credibility. For the same reasons, Defendant also claims that insufficient evidence existed to support the trial judge's *Enmund/Tison* finding. *See Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

¶ 46 Only six of the twelve jurors found Defendant guilty of premeditated murder. However, the jury unanimously found Defendant guilty of felony murder. Because Defendant was convicted of only felony murder, we must ascertain whether he is death eligible. In *Enmund*, the United States Supreme Court held that a felony murder defendant could receive the death penalty only if he actually killed, attempted to kill, or intended to kill. 458 U.S. at 797, 102 S.Ct. at 3376. The Court's subsequent decision in *Tison* expanded this rule, allowing capital punishment when the defendant was a major participant in the underlying felony and acted with reckless indifference to human life. 481 U.S. at 157–58, 107 S.Ct. at 1688.

¶ 47 In his special verdict, the trial judge here found that:

the Defendant is the one who killed Mr. Magoch. The evidence also clearly established beyond a reasonable doubt that the Defendant was a major participant in the armed robbery of Mr. Magoch that result-ed in him being killed and that the Defendant's conduct exhibited a reckless disregard for human life.

Special Verdict, at 2.

¶ 48 Without Greenham's testimony at the sentencing hearing, we conclude that the evidence admitted at trial failed to prove, beyond a reasonable doubt, that Defendant was a major participant in the armed robbery or that he actually murdered Magoch. The presence of $270,000 in Defendant's garage, scraps of paper written by Defendant regarding other armored car routes and "splits" of money, and intercepted phone calls between Defendant, Ferguson, and Greenham only proved that Defendant helped plan the robbery. None of it, however, linked Defendant to the act of killing Magoch. In addition, although there was evidence that Defendant's truck may have been used in the robbery, no trial evidence ever placed Defendant at the scene. A rifle with an attached homemade silencer was recovered from Defendant's garage; yet that weapon was never conclusively connected to the murder. Although the trial evidence established Defendant's participation in planning the robbery and his further participation in concealing the proceeds from the crime, it provided almost nothing about why Magoch was killed or who carried out the murder. There also was no evidence at trial to establish even reckless indifference. For all we know from the trial evidence, Defendant did not participate in, plan, or even expect the killing. This lack of evidence no doubt explains why the jury found Defendant guilty of felony, but not premeditated, murder.

¶ 49 When imposing sentence in a capital case, the trial judge does not rely exclusively on the evidence admitted at trial but also takes into consideration the evidence presented at the sentencing hearing. A.R.S. § 13–703.E. Given Greenham's testimony that he, Ferguson, and Defendant "planned on robbing an armored car," that Defendant had "taken the role as leader," and Defendant "shot Mr. Magoch," the trial judge's finding is supported. R.T., October 19, 1997, at 38–40.

### 3. Aggravating factors

#### a. Heinousness and depravity

¶ 50 Defendant challenges the trial judge's finding of the aggravating circumstance that Defendant murdered Magoch in a heinous or depraved manner. A.R.S. § 13–703.F.6. At the sentencing hearing Greenham stated that when he, Defendant, and Ferguson met the day after the robbery to count the stolen money, the three were in a "pretty happy mood" because they "had all the money." R.T., October 9, 1997, at 59. In addition, although Greenham said he was "distraught because Mr. Magoch was dead," he testified that Defendant stated in an "off-hand" manner, "you guys are forgetting something . . . you're forgetting to congratulate me on my shot." It is exclusively from this testimony that the trial judge based his finding that Defendant "did not appreciate the seriousness of his conduct," "took great liking or enjoyment in his actions," displayed "an abhorrent lack of regard for human life," and "seemed to savor or enjoy the murder." Special Verdict, at 4. In short, the judge believed Defendant "relished" the murder. Although the judge noted that he was "mindful in determining the facts as to this statutory aggravating circumstance" that Greenham's "credibility as a witness is an issue" and that Greenham's "statement is uncorroborated," he nonetheless "resolve[d] that Mr. Greenham is credible." *Id.* at 3. Relishing a victim's death is one of the enumerated *Gretzler* factors that will support a finding of heinousness or depravity. 135 Ariz. at 52, 659 P.2d at 11.

¶ 51 Defendant argues that uncorroborated testimony from an accomplice that he celebrated is insufficient evidence to support a finding of relishing. *See State v. Smith,* 138 Ariz. 79, 86, 673 P.2d 17, 24 (1983). Even assuming Greenham's testimony was credible, Defendant says the statements attributed to him merely demonstrate that he is a callous individual, indifferent to human life, who was impressed with his marksmanship. Defendant was a promising competitive shooter, had extensive firearms training, and even assisted as a firearms instructor for correctional officers. Therefore, Defendant argues, his comment was merely an expression of pride over his marksmanship.

¶ 52 The analysis of heinousness and depravity "focus[es] on the defendant's mental state and attitude as reflected by his words and actions." *State v. Brewer,* 170 Ariz. 486, 502, 826 P.2d 783, 799 (1992). In addition, post-murder behavior is relevant when it provides evidence of the killer's state of mind at the time of the offense. *State v. Greene,* 192 Ariz. 431, 440 ¶ 39, 967 P.2d 106, 115 ¶ 39 (1998). Although a perpetrator's cold and deliberate actions may establish the requisite intent for the crime of first-degree murder, they do not demonstrate heinousness or depravity and are of no consequence in making the sentencing decision. *State v. Smith,* 146 Ariz. 491, 504, 707 P.2d 289, 302 (1985). Statements suggesting indifference constitute relishing only when they indicate that the killer savored or enjoyed the murder. *Greene,* 192 Ariz. at 440–41 ¶ 39, 967 P.2d at 115–16 ¶ 39.

¶ 53 Although Defendant's statements reflect a calculated plan to kill, satisfaction over the apparent success of his plan, and an extreme callousness or lack of remorse after the murder, the evidence does not support a finding that Defendant actually relished the *act* of murdering Magoch. Thus, the statements do not demonstrate that Defendant's state of mind during the time of the offense was heinous or depraved.

¶ 54 The state argues that because the armored car could have been robbed without killing Magoch, the murder was senseless and we can independently uphold the trial judge's finding of depravity and heinousness based on the senselessness of the crime. The murder of a victim when it was unnecessary to carry out the robbery may be senseless. *State v. Medina,* 193 Ariz. 504, 514 ¶ 39, 975 P.2d 94, 104 ¶ 39 (1999). The state asserts that Defendant could have seized the armored van without killing Magoch, whom the state claims was standing outside the van. However, there was no testimony offered at trial that supported this argument except that Magoch, who was a smoker, had a tendency to open the van's driver-side door for ventilation while he

smoked because the windows in the van did not roll down. Indeed, no trial testimony substantiated the state's theory that this was the situation at the time the armored van was taken. In contrast, Greenham testified at the sentencing hearing that, on the day of the robbery, Magoch had "opened his door about six to eight inches" to smoke a cigarette. R.T., October 9, 1997, at 45. According to Greenham, Magoch was turned sideways in his seat with the van door slightly open, only his head was outside of the van, and his feet were resting on "the little van ledge." *Id.* at 78. In such circumstances, it is possible the perpetrators believed that, absent a potentially protracted and boisterous struggle, successfully subduing Magoch or gaining access to the vehicle was improbable without killing him first. While none of these grisly speculations justify or mitigate the crime, they do illustrate that the entire inquiry is pointless. Any murder is senseless in its brutality and finality. Yet not all murders are senseless as this term is used to distinguish those first-degree murders that deserve a death sentence and those that do not. We classify the senselessness of Magoch's death in this case as one of the latter.

¶ 55 Finally, senselessness alone cannot support a heinous/depraved finding. *State v. Lee*, 189 Ariz. 590, 605–06, 944 P.2d 1204, 1219–20 (1997). Indeed, in previous robbery cases in which we have upheld a death sentence based on senselessness, senselessness has been present as a makeweight in combination with other aspects of heinousness and depravity. *See, e.g., Medina*, 193 Ariz. at 514 ¶ 41, 975 P.2d at 104 ¶ 41 (relishing, gratuitous violence, and helplessness); *State v. Hyde*, 186 Ariz. 252, 282, 921 P.2d 655, 685 (1996) (helplessness and gratuitous violence); *State v. Jackson*, 186 Ariz. 20, 30, 918 P.2d 1038, 1048 (1996) (helplessness and relishing); *State v. Runningeagle*, 176 Ariz. 59, 65, 859 P.2d 169, 175 (1993) (helplessness and relishing); *State v. Spencer*, 176 Ariz. 36, 43, 859 P.2d 146, 153 (1993) (needless mutilation of victim); *State v. Comer*, 165 Ariz. 413, 429, 799 P.2d 333, 349 (1990) (relishing, gratuitous violence, and helplessness); *State v. Correll*, 148 Ariz. 468, 481, 715 P.2d 721, 734 (1986) (gratuitous violence and helplessness).

¶ 56 We conclude that the evidence in this case does not support a finding of depravity or heinousness beyond a reasonable doubt. Therefore, the trial judge's finding of the heinous and depraved factor is disapproved.

### b. Pecuniary gain

¶ 57 To prove pecuniary gain as an aggravating factor the state must demonstrate that the motivation for the murder was the expectation of financial gain. *State v. Trostle*, 191 Ariz. 4, 17–18, 951 P.2d 869, 882–83 (1997). Here, killing Magoch was for no other comprehensible reason than to facilitate the robbery. When making his finding in the special verdict, the trial judge stated:

> The evidence clearly shows beyond a reasonable doubt that Mr. Magoch was killed in order to obtain the approximately one-half million dollars in cash in the armored car. Taking the cash from the armored car was the motive and reason for Mr. Magoch's murder and not just the result.

Special Verdict, at 3. Under the facts of this case, including Greenham's testimony, the trial judge's finding is "clearly warranted." *Cf. State v. Poland*, 144 Ariz. 388, 406, 698 P.2d 183, 201 (1985). Therefore, the trial judge's application of the pecuniary gain aggravating factor is supported.

¶ 58 Defendant claims, in both his brief and again at oral argument, that A.R.S. § 13–703.F.4 and 5 make the buying and selling of murder an aggravating factor and that one should not be put to death for the "common sin of greed." Arguably, there once was "considerable disagreement" as to the meaning of subsection F.5. *Greene*, 192 Ariz. at 445 ¶ 69 n. 1, 967 P.2d at 120 ¶ 69 n. 1 (Zlaket, C.J., dissenting). However, this court has long interpreted F.5 to include any murder in which pecuniary gain was a motive, cause, or impetus and not merely the result of the killing. *State v. Kayer*, 194 Ariz. 423, 433 ¶ 32, 984 P.2d 31, 41 ¶ 32 (1999). In addition, we do not consider the planned robbery and murder of an armored car driver to be simply a result of the "common sin of greed." Defendant's argument is without merit.

## 4. Mitigating factors

### a. Lack of prior criminal history

¶ 59 In his special verdict, the trial judge did not find the presence of any statutory mitigating circumstances and determined that only one unenumerated mitigating circumstance existed: Defendant's minimal criminal record. Apparently, neither Defendant nor his attorney presented much mitigating evidence to the court because, as Defendant's attorney explained during the sentencing hearing, it was believed that:

> The sole issue in this case is going to be for the Court to determine whether or not the State has proven [Defendant's] participation and the extent of that participation beyond a reasonable doubt; i.e., did he or did he not personally kill John Magoch in this case.

R.T., October 20, 1997, at 7. Addressing this issue in his special verdict, the trial judge noted:

> This Court rejects that the Defendant has proved by a preponderance of the evidence that Mr. Greenham, and not the Defendant, was the shooter or that the Defendant was not at the scene of the robbery/murder regardless of who else may have been present and shot Mr. Magoch.

Special Verdict, at 5.

¶ 60 On appeal, Defendant argues that the judge failed to give sufficient weight to Defendant's minimal criminal record, especially in light of Defendant's previous work as a bounty hunter, police and correctional officer, and confidential informant. Although Defendant does not have any prior felony convictions, he does have two prior misdemeanor convictions for carrying a concealed weapon and impersonating a public servant arising out of a bounty-hunting incident in 1993. In addition, Defendant's employment as a police officer was less than exemplary. The chief of the police department at which Defendant was employed for approximately a year stated that Defendant was fired for insubordination when he refused to respond to a homicide scene in favor of engaging in a high-speed chase. As for Defendant's experiences as a correctional officer, bounty hunter, and confidential informant, it is difficult to imagine how these jobs serve as mitigating circumstances. Instead, because Defendant abused his law-enforcement experience and contacts before and after the crimes—to plan and execute the murder, as well as to attempt to avoid capture—these facts, even if mitigating, are entitled to minimal weight.

### b. Other possible mitigation evidence

¶ 61 Because Defendant claims to have not participated in the crime at all, the statutory mitigating circumstance of minor participation is inapplicable. A.R.S. § 13–703.G.3. Nevertheless, the evidence would not support such a finding. Although Defendant continues to insist on his complete innocence, when a defendant is found guilty beyond a reasonable doubt, unsupported and unfounded claims of actual innocence do not constitute mitigation for sentencing purposes. *State v. Amaya–Ruiz*, 166 Ariz. 152, 179, 800 P.2d 1260, 1287 (1990). Even if residual doubt is a mitigating circumstance, on this record we are left with no residual doubt about Defendant's guilt. In addition, no other evidence exists in the record to merit leniency.

## 5. Independent reweighing

¶ 62 We have determined that the trial judge incorrectly found the aggravating factor of heinousness and depravity. *See supra* ¶ 56. When the trial judge errs in aggravation or mitigation findings, remand is generally not appropriate unless the judge wrongly excluded evidence or the record does not adequately reflect all of the relevant facts. A.R.S. § 13–703.01.C. Neither situation is present here. In his special verdict, the trial judge added the following:

> The Court specifically notes that had the State proved beyond a reasonable doubt only [the] statutory aggravating circumstance [of pecuniary gain] that there remains still no mitigating circumstances sufficiently substantial to call for leniency. This was a cold-blooded, very calculated and premeditated murder to facilitate the robbery of thousands and thousands of dollars. The evidence is overwhelming

that the Defendant was a principal, chief participant in the whole scheme.

Special Verdict, at 5–6.

■ ¶ 63 We have previously upheld the death penalty in a case in which pecuniary gain was the only aggravating circumstance. *See State v. Hensley*, 142 Ariz. 598, 603–04, 691 P.2d 689, 694–95 (1984) (defendant was sentenced to death after shooting three people in the course of robbing a bar; only mitigating circumstance was that defendant had obtained a G.E.D.). After our independent review, we conclude that even crediting Defendant's minimal criminal record, the mitigating evidence is not sufficient to call for leniency in light of the facts of this case. This murder was not the result of sudden impulse or loss of control nor a robbery gone bad but a planned, ruthless robbery and killing.

### C. Alleged constitutional defects raised to avoid preclusion

¶ 64 Defendant brings numerous constitutional challenges to Arizona's death penalty scheme to avoid potential procedural default and preserve review. We have previously addressed the challenges as follows:

> Requirement that mitigating circumstances be proven by a preponderance of the evidence improperly precludes certain mitigating facts, rejected in *State v. White*, 194 Ariz. 344, 355 ¶ 49, 982 P.2d 819, 830 ¶ 49 (1999).

> Arizona's death penalty statute is unconstitutional on its face and as applied, rejected in *id.; State v. Schackart*, 190 Ariz. 238, 260, 947 P.2d 315, 337 (1997); *but see supra* ¶¶ 40–44.

> Arizona's death penalty statute is unconstitutional because it requires death when, in the absence of any mitigating circumstances, only one aggravating circumstance is found, rejected in *State v. Van Adams*, 194 Ariz. 408, 422 ¶ 55, 984 P.2d 16, 30 ¶ 55 (1999).

> Arizona's death penalty statute is unconstitutional because defendants do not have an opportunity to death qualify the sentencing judge, rejected in *White*, 194 Ariz. at 355 ¶ 49, 982 P.2d at 830 ¶ 49.

> Arizona's death penalty statute fails to provide proper guidance to the sentencing judge, rejected in *Van Adams*, 194 Ariz. at 422 ¶ 55, 984 P.2d at 30 ¶ 55.

> Arizona's death penalty statute is unconstitutional as it requires a defendant to prove that his life should be spared, rejected in *id.* at 423 ¶ 55, 984 P.2d at 31 ¶ 55.

> Arizona's death penalty statute is unconstitutional as it fails to sufficiently channel the sentencing judge's discretion, rejected in *id.*

> Arizona's death penalty statute is unconstitutional because it fails to require the state to prove that a sentence of death is appropriate, rejected in *id.*

> The lack of proportionality review is a due process violation, rejected in *id.*

> Arizona's death penalty statute is unconstitutional because it does not require the sentencing judge to find that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt, rejected in *White*, 194 Ariz. at 355 ¶ 49, 982 P.2d at 830 ¶ 49.

> Arizona's death penalty statute is unconstitutional because it fails to provide a defendant the means to voir dire the sentencing judge, rejected in *id.* at 356 ¶ 49, 982 P.2d at 831 ¶ 49.

### CONCLUSION

¶ 65 For the foregoing reasons, we affirm Defendant's convictions and sentences.

CONCURRING: THOMAS A. ZLAKET, Chief Justice, CHARLES E. JONES, Vice Chief Justice, RUTH V. McGREGOR, Justice.

MARTONE, Justice, concurring in the judgment.

¶ 66 While I join the court in affirming the convictions and sentences, I write separately to explain why I do not join part B(1) and paragraph 48 of part B(2) of the court's opinion.

### I.

¶ 67 In part B(1), the court says "we must acknowledge that both cases [*Jones* and *Ap-*

*prendi*] raise some question about the continued viability of *Walton.*" *Ante,* ¶ 40. The court goes on to say it must explain Arizona's death penalty scheme because of the "unclear language of the Court's *Apprendi* and *Jones* opinions." *Id.* But *Apprendi* was quite express in distinguishing *Walton.* The opinion states that "this Court has previously considered and rejected the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death." *Apprendi v. New Jersey,* 530 U.S. 466, 496, 120 S.Ct. 2348, 2366, 147 L.Ed.2d 435 (2000). The Court noted that the judge does not determine the existence of a factor which makes a crime a capital offense. Rather, the statute itself defines first degree murder as a capital offense. The jury finds the defendant guilty of all of the elements of first degree murder. "[I]t may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed." *Id.,* 120 S.Ct. at 2366 (citation omitted).

¶ 68 The majority seizes upon language in the *Apprendi* dissent to question *Walton.* But the dissent in *Apprendi* was not a challenge to *Walton.* Instead, it was a challenge to the majority holding in *Apprendi.* The *Apprendi* dissent acknowledged that the *Ap-*

*prendi* majority likely held "that the Constitution requires that a fact be submitted to a jury and proved beyond a reasonable doubt only if that fact, as a formal matter, extends the range of punishment *beyond the prescribed statutory maximum.*" 530 U.S. at 540, 120 S.Ct. at 2389 (O'Connor, J., dissenting) (emphasis in original). Justice O'Connor noted that because A.R.S. § 13–1105(C) "itself authorizes both life imprisonment and the death penalty," *id.,* 120 S.Ct. at 2389, the statute authorizes the maximum penalty of death in a formal sense.

¶ 69 In this case, Ring's punishment was not above the statutory range allowed by the jury's guilty verdict. Death is plainly within the statutory range of a guilty verdict for first degree murder. A.R.S. § 13–1105(C). Such a verdict is essential to a finding that a defendant is death eligible. Only first degree murder is a capital offense. One cannot be sentenced to death without such a verdict. The jury must find all the elements of the charge under *Apprendi* and the Sixth Amendment. The factual findings in aggravation and mitigation made by the trial court are not elements of the charge triable by jury under the *Sixth* Amendment, but rather, capital sentencing limitations driven by the *Eighth* Amendment. *Walton v. Arizona,* 497 U.S. 639, 648, 110 S.Ct. 3047, 3054–55, 111 L.Ed.2d 511 (1990).[1]

---

1. The Court explained in *Walton:*

> Walton also suggests that in Florida aggravating factors are only sentencing "considerations" while in Arizona they are "elements of the offense." But as we observed in *Poland v. Arizona*[, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986)], an Arizona capital punishment case: "Aggravating circumstances are not separate penalties or offenses, but are 'standards to guide the making of [the] choice' between the alternative verdicts of death and life imprisonment. Thus, under Arizona's capital sentencing scheme, the judge's finding of any particular aggravating circumstance does not of itself 'convict' a defendant (*i.e.,* require the death penalty), and the failure to find any particular aggravating circumstance does not 'acquit' a defendant (*i.e.,* preclude the death penalty)." Our holding in *Cabana v. Bullock,* provides further support for our conclusion. *Cabana* held that an appellate court could constitutionally make the *Enmund v. Florida* finding—that the defendant killed, attempted to

> kill, or intended to kill—in the first instance. We noted that *"Enmund,* 'does not affect the state's definition of any substantive offense, even a capital offense,'" and that "while the Eighth Amendment prohibits the execution of such defendants, it does not supply a new element of the crime of capital murder that must be found by the jury." *Enmund* only places "a substantive limitation on sentencing, and like other such limits it need not be enforced by the jury." If the Constitution does not require that the *Enmund* finding be proved as an element of the offense of capital murder, and does not require a jury to make that finding, we cannot conclude that a State is required to denominate aggravating circumstances "elements" of the offense or permit only a jury to determine the existence of such circumstances.
>
> We thus conclude that the Arizona capital sentencing scheme does not violate the Sixth Amendment.
>
> 497 U.S. at 648–49, 110 S.Ct. at 3054–55 (citations omitted).

## II.

¶ 70 In *Cabana v. Bullock*, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), the Court made it clear that *Enmund/Tison* findings may be made by the trial court and even an appellate court, rather than a jury. And yet, without explanation, the majority says that it is relevant that "[w]ithout Greenham's testimony at the sentencing hearing, we conclude that the evidence admitted at trial failed to prove, beyond a reasonable doubt, that Defendant was a major participant in the armed robbery or that he actually murdered Magoch." *Ante,* ¶ 48. I do not understand the relevance of any of the observations made in paragraph 48 of the majority's opinion. It would have been enough to say that the trial court's *Enmund/Tison* finding was supported by the evidence. The presence of paragraph 48 in the majority opinion, together with its discussion of *Apprendi*, suggests that the majority not only believes that *Apprendi* may affect *Walton,* but that *Apprendi* may affect *Cabana.* Yet *Apprendi* makes no mention of *Cabana,* and Ring does not raise the issue here. I would not reach out to comment on issues not presented.