790 A.2d 612

Steven Howard OKEN,

v.

STATE of Maryland.

No. 16, Sept. Term, 2001.

Court of Appeals of Maryland.

Feb. 6, 2002.

Fred Warren Bennett (Bennett & Nathans, LLP), Greenbelt, for appellant.

Ann N. Bosse, Asst. Atty. Gen. of Baltimore, for appellee.

Submitted before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

## ORDER

The Court having considered the Petitioner's motion for stay of warrant of execution, the response in opposition to the motion and the Petitioner's reply to the response, it is this 6th day of February, 2002,

ORDERED, by the Court of Appeals of Maryland, that the motion for stay of warrant of execution be, and it is hereby, GRANTED, and the warrant of execution issued by the Circuit Court for Baltimore County (Turnbull, J.) on January 15, 2002, is stayed pending the timely filing in the Supreme Court of the United States of a petition for a writ of certiorari and the disposition of this case by the Supreme Court of the United States.

Concurring Opinion by WILNER, J., in which HARRELL, J., joins on Granting of Stay.

I have agreed to this stay of the Circuit Court's warrant only because, under the law, Oken has until early April to file a petition for *certiorari* with the United States Supreme Court and the warrant calls for his being put to death a month earlier. Although I do not believe that his case has any substantive merit, the *Apprendi* issue that he wishes to raise in the Supreme Court is not a frivolous one. This Court was split four-to-three on the issue and the Supreme Court, in granting *certiorari* in *Arizona v. Ring,* 200 Ariz. 267, 25 P.3d 1139, *cert. granted,* —— U.S. ——, 122 S.Ct. 865, 151 L.Ed.2d 738 (2002), has apparently agreed to consider the application of its *Apprendi* decision to a death penalty statute. Although Judge Cathell does not believe that a decision by the Supreme Court in *Ring* will affect this case, and he may well be right, no one knows for certain at this point, and Oken ought to have the full opportunity provided by law for seeking relief in the Supreme Court. I regard it as at least implicit that the Circuit Court is free to issue another warrant, promptly and without further leave of this Court, should (1) Oken fail to file a timely petition for *certiorari* in the Supreme Court, or (2) the Supreme Court deny any petition for *certiorari* filed by him.

Judge HARRELL joins in this opinion.

Dissent to the Granting of a Stay by CATHELL, Judge.

I would deny the stay.

First, to be honest, if I were a member of the legislative branch of government, I would probably vote to abolish the death penalty. I would not vote in that fashion because of any constitutional or moral principle. I would so vote because it is clear to me that because of the way the death penalty system works, it simply is not worth the aggravation it costs throughout the body politic. Two years ago, while working on a personal project, I had occasion to examine more fully the costs of the death penalty system. At that time, some statis-

tics I examined indicated that, on average, there were approximately 270 persons sentenced to death throughout the country each year. With the extensive efforts made to insure that innocent persons are not subjected to the ultimate penalty, the cost and time to process a death penalty case is exorbitant. It was estimated in some of the studies that to process a death penalty case and to maintain a death penalty defendant in death row security, costs $400,000 over and above what it would normally cost to process, and then maintain a prisoner serving a life sentence.

If those statistics are accurate, governments throughout our country, by permitting the imposition of the death penalty, collectively obligate themselves for an expenditure of a hundred million dollars each year above what they would ordinarily expend if such defendants had been sentenced to life imprisonment. Even if the extra costs were only $40,000, governments would obligate themselves each year for future spending of over $10,000,000. Based on the sum of $7,000 (which is the approximate level of in-state tuition at our State universities), a year's tuition for tens or even hundreds of thousands of students at state universities could be funded by the extra costs we incur to process and maintain 270 people per year, however deserving, in the death penalty system. A relevant question, it seems to me, is whether the country would be better served by using the money for education, or for other aspects of need in this country than it is now being served by the process we put ourselves through putting a few murderers to death?

Additionally, the process imposes upon the system huge administrative and procedural burdens. It is also a system that lends itself to attacks in individual cases that are both principled and unprincipled at the same time. Attorneys take an oath that imposes upon them an ethical duty not to engage in frivolous actions or actions engaged in for the sole purposes of delay. Yet, at least partially due to the draconian aspects of the death penalty, some participants may look the other way in death cases because they have professional and conflicting ethical obligations towards the client, and, also, be-

cause they question the moral principles inherent in the imposition of death by a civilized society. Throughout the country, there are laymen and lawyers who, because of their professional obligations to clients and their own personal beliefs in respect to the death penalty, participate in obstructive tactics in an effort to delay the imposition of the death penalty in the hope that during the delay the Supreme Court, or the respective state legislative bodies, will abolish the penalty altogether.

What results is the use of extraordinary steps or tactics throughout the process to forestall the imposition of the penalty imposed. The process must appear to those outside the system to be a game played by lawyers and judges, rather than the serious process it should be. This case is but one of many cases where defendants are resisting the imposition of death penalties, by presenting issues, that, in my opinion, are not worthy of further consideration.

With all of that said, and with the understanding that the Supreme Court has held the death penalty itself to be constitutional, and with the further understanding that the legislative branch of Maryland government has made the policy decision that the death penalty is appropriate in Maryland under certain circumstances, and that policy decision is its to make, and, when made, binding on the courts, let us examine whether the stay should be granted in this case. This case involves a defendant who has been described elsewhere (correctly, in my view) even by those opposed in principle to the death penalty as a "poster man for the death penalty."

In prior cases, this Court, as to the facts of the murder here involved, found:

"At midnight on Sunday, November 1, 1987, Keith Douglas Garvin arrived at the United States Navy base in Oceana, Virginia. Mr. Garvin, who had a pass from his naval superiors, had just spent the weekend with his wife, Dawn Garvin, at their apartment in the Baltimore County community of White Marsh and was returning to his station in Oceana. Upon his arrival at the base, Mr. Garvin at-

tempted to call his wife to notify her that he had arrived safely. Although the telephone rang at their White Marsh apartment, there was no answer. After making several additional unsuccessful attempts to call his wife, Mr. Garvin became worried and telephoned his father-in-law, Frederick Joseph Romano. Because Mr. Romano lived in close proximity to the Garvins' apartment, Mr. Garvin asked Mr. Romano to check on his wife. Mr. Romano agreed, and attempted to telephone his daughter twice. Both times there was no answer. Concerned about the fact that numerous calls to his daughter had gone unanswered, Mr. Romano decided to drive to his daughter's apartment.

When Mr. Romano arrived at his daughter's apartment, he found the front door to the apartment ajar, all the lights in the apartment turned on, and the television blaring. Sensing that something was wrong, Mr. Romano rushed into the apartment and found his daughter, Dawn, in the bedroom lying on the bed nude with a bottle protruding from her vagina. While attempting to give her cardiopulmonary resuscitation ('CPR'), Mr. Romano observed that there was blood streaming from her forehead. He immediately called for assistance, and paramedics arrived shortly thereafter. A paramedic then began to administer CPR, but his efforts were in vain. Dawn Marie Garvin was dead.

At 2:30 a.m., on November 2, Detective James Roeder of the Baltimore County Police Department arrived at the Garvins' apartment to inspect the scene of the murder. Detective Roeder testified that when he entered the Garvins' apartment he saw no signs of forced entry. Once inside, he observed a brassiere, a pair of pants, tennis shoes, a shirt, and a sweater on the floor near the sofa in the living room. The brassiere was not unhooked, but instead, was ripped on the side. The pants were turned inside out. Roeder also noticed a small piece of rubber on the floor near the television set. In the bedroom, Roeder found two spent .25 caliber shell casings on the bed, one of which was lying on top of a shirt. The shirt was blood stained and had what Roeder believed to be a bullet hole in it.

An autopsy of Ms. Garvin's body revealed that she had died as the result of two contact gunshot wounds; one of the bullets entered at her left eyebrow and the other at her right ear.

The last person to see Dawn Garvin before she was fatally attacked was her brother, Frederick Anthony Romano. At 8:30 p.m. on November 1, Mr. Romano stopped by his sister's apartment to pick up a set of keys to Keith Garvin's car. Mr. Garvin had left the car at the White Marsh apartment so that it could be repaired during the week. Mr. Romano only stayed at his sister's apartment for about five minutes. When he left the apartment, Ms. Garvin was preparing to walk her dog . . . .

. . .

At 9:00 a.m. on the morning of November 16, 1987, approximately two weeks after Dawn Garvin's murder, Sergeant Sidney Branham of the Baltimore County Police Department was patrolling the White Marsh area when he received a dispatch of a 'suspicious condition' concerning a missing person at 62 Stillwood Circle, a townhouse which was the residence of Oken and his wife, Phyllis Hirt Oken. Sergeant Branham went to that address and was met by four individuals standing outside of the home. One of those individuals, a Ms. Danielle Jones, informed Sergeant Branham that 'she had reason to believe that her sister, Patricia Hirt, was missing and that some harm had come to her, and she came to 62 Stillwood Circle to locate her sister.' Jones also told Sergeant Branham that when she arrived at this address, she found the door to the residence partially ajar and entered. Jones related that while inside the house, she had noticed that it was in disarray and that there was blood on the floor near the front entrance.

On the basis of Jones's story, Sergeant Branham decided that he and Lieutenant Harvey should enter the house 'to see if there was anyone injured in the house, [and] to look for any suspect.' Once inside the house, Sergeant Branham made certain observations. He saw blood smeared on the floor in the foyer and on the door post, a towel lying on top

of a trash can in the kitchen with what appeared to be dried blood stains on it, and articles of women's clothing strewn about the floor in the living room. When Sergeant Branham left the house, he posted an officer at the front door to secure the premises until a search warrant could be obtained.

Later that same morning, at about 10:00 a.m., Detective Charles Naylor of the Baltimore County Police Department received a telephone call asking him to proceed to an area near Interstate 95 and White Marsh Boulevard in Baltimore County where the body of a dead woman had been found by the Maryland State Police. Detective Naylor went to this area to investigate. Approximately one hour later, the body of the dead woman was identified as Patricia Hirt.[4]

4. Subsequent to his conviction and sentence in the instant case, Oken pleaded guilty to the murder of Patricia Hirt.

After the discovery of the dead woman's identity, Detective Naylor was sent to 62 Stillwood Circle where he met with Sergeant Branham. Sergeant Branham informed Detective Naylor of his observations inside the home. Based on these observations and the discovery of Patricia Hirt's body, Detective Naylor prepared an affidavit and application for a search and seizure warrant for Oken's home at 62 Stillwood Circle. A warrant was signed by Judge A. Gordon Boone, Jr., and Detective Naylor returned to 62 Stillwood Circle to execute the warrant. During the search, Detective Naylor seized a .25 caliber handgun from a dresser drawer in the master bedroom. This gun was later determined to be the weapon that was used to kill Dawn Garvin.

. . .

*Oken's Arrest in Maine on November 17, 1987*

At approximately 1:00 p.m. on November 16, 1987, the same day the Maryland State Police discovered Patricia Hirt's dead body, Oken checked into the Coachman Motor Inn ('Coachman') in Kittery, Maine. According to the general manager of the motel, Diana Ott, Oken stated that he

only wanted the room for one night. After filling out the registration form which indicated that he was driving a white Ford Mustang with Maryland registration plates, Oken paid for his room in advance with a Visa credit card. As Ott handed Oken the keys to room 48, the telephone rang. Ott answered, and as she was talking on the telephone, she realized that she still had Oken's credit card in her hand. Ott telephoned Oken in his room and asked him to come back to the desk and get his card at his convenience. At 2:30 p.m., Ott's shift at the registration desk ended. She was replaced by Lori Ward. Since Oken had not returned to claim his card at the time Ott and Ward changed shifts, Ott informed Ward that Oken might be coming to the desk for his card. Ott then went home.

Later that evening, at approximately 6:00 p.m., Ott telephoned the registration desk to check on Ward. There was no answer to her call. Ott continued to call Ward but received no answer. She then telephoned the motel's maintenance man and asked him to check on Ward. The maintenance man returned Ott's telephone call about ten minutes later. He informed Ott that Ward had been found murdered.[5] Ott immediately left for the motel. She arrived at the motel around 6:30 p.m. and stayed there until 12:30 a.m. During that time she did not see Oken or his Mustang.

5. Prior to his trial for the murder of Dawn Garvin, Oken was convicted in Maine of the murder of Lori Ward.

On that same day, Oken drove to Freeport, Maine, which is approximately a one hour drive from the Coachman. At 7:54 p.m., Oken checked into the Freeport Inn. According to the desk clerk, Katherine Jones, Oken paid in cash for one night's stay in room 250. As Oken was walking away from the desk, Jones observed blood on the back of his head. Jones brought this fact to Oken's attention, but Oken indicated that he was 'okay.' Sometime between 10:00 a.m. and 10:30 a.m. on the following morning, November 17, 1987, Oken paid for an additional night's lodging at the Freeport Inn. Oken never checked out of the Coachman.

. . .

The police began their investigation of Ward's murder by knocking on the doors of every motel room in the Coachman, including Oken's room, Room 48. There was no response at Room 48 . . . .

. . .

At 8:00 a.m., on November 17, the Kittery police arrived [again] at the Coachman. . . . There was no answer at Room 48, so the police unlocked the door and entered the room. Once inside Room 48, the police discovered a bottle of vodka, a half-gallon of orange juice, a few small pieces of rope, a pair of socks, a shirt with blood stains on it, and blood smudges on the wall in the bathroom. There were no toilet articles, personal belongings, luggage, or any kind of bags in the room, and the bed had not been turned down.

After discovering these articles in Room 48, the police went to Ott, and asked her who was the last person to stay in Room 48. She checked her records and informed the police that Oken was the last individual to occupy Room 48. She also gave them the license tag number for the vehicle he was driving. When the police sought information by teletype about the registration of that automobile, they learned that Oken was wanted in connection with two murders in Maryland and that the car he was driving had been stolen the previous day in Maryland.

At approximately 5:10 p.m., on November 17, 1987, Oken was arrested at the Freeport Inn. Upon his arrest, the police seized the tennis shoes that he was wearing along with all his personal belongings and his car. During the guilt or innocence stage of Oken's trial, one of the tennis shoes seized was matched with the piece of rubber found in Dawn Garvin's apartment on the night of her murder."

*Oken v. State,* 327 Md. 628, 634–49, 612 A.2d 258, 261–68 (1992) (some alterations in original).

There was additional evidence discovered that indicated that Oken had planned his serial criminal activity. A note in his handwriting was discovered in his home, that, in relevant part, stated:

"[G]auze pads; 5 by 11 inches by 4 inches, chloroform, N25B, gag; sock and adhesive tape, two inches by five inches by five yards; surgical gloves from the store, camera, come, [sic] film and flash; store; panty hose, dark color to cover hair and face; reading glasses; dildos; vibrators; et cetera, possible capsules, glass covers, store."

*Oken,* 327 Md. at 664, 612 A.2d at 276. At sentencing, a psychiatrist testified that Oken related to him the actual details of the murder of Mrs. Garvin:

"I was told by Mr. Oken that he approached the victim outside the apartment, asked if he could use the phone, made his way into her apartment, looked about, shut the door, took out a gun and asked that she get undressed. He asked her to begin masturbating. He masturbated. At the same time he then asked her to get up and perform oral sex on him. He then pushed her back. He got on top of her, he tried to have intercourse, he did this in different positions, including anal sex. He got up at some point, went into the kitchen, brought back a bottle, Durkee's hot sauce bottle, which he said he inserted into her vagina. He made her take the bottle in and out. He was masturbating at the same time. He became angry because he couldn't reach climax and then he killed her."

*Oken,* 327 Md. at 679, 612 A.2d at 283.

I now examine the present procedural status of the case. After our resolution of the direct appeal arising out of his trial court conviction and sentencing that I have referred to above, Oken sought review of his case by the United States Supreme Court. His Petition for Certiorari was denied in 1993. *Oken v. Maryland,* 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993). He then filed a Petition for Post Conviction Relief with the trial court in which he raised over fifty questions as to the lawfulness and constitutionality of his conviction and sentence. He was denied relief by the trial court in 1994. Oken then sought leave to appeal the decision of the trial court, which we granted. We, however, found no error in the decision of the trial court and affirmed its decision. *Oken v.*

*State,* 343 Md. 256, 681 A.2d 30 (1996). Oken again sought to have the Supreme Court of the United States review his case. That Court declined to review it. *Oken v. Maryland,* 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 681 (1997). Oken then filed a motion for this Court to reconsider our prior decision. We declined to do so.

In 1997, ten years after the body of Oken's first victim was found, Oken filed a petition for habeas corpus relief with the U.S. District Court for the District of Maryland. *Oken v. Nuth,* 30 F.Supp.2d 877 (D.Md.1998). The United States District Court denied him any relief. *Oken v. Nuth,* 64 F.Supp.2d 488 (D.Md.1999). Oken appealed that decision to the United States Court of Appeals for the Fourth Circuit. That Court affirmed the District Court decision denying relief to Oken. *Oken v. Corcoran,* 220 F.3d 259 (4th Cir.2000). Oken then sought review by the United States Supreme Court and that Court again declined to hear his petition. *Oken v. Corcoran,* 531 U.S. 1165, 121 S.Ct. 1126, 148 L.Ed.2d 992 (2001). In February of 2001, Oken filed two motions in the circuit court. One was to reopen his post-conviction case and the other alleged that his sentence was illegal and that he should, therefore, be awarded a new sentencing hearing. The last motion was based upon his counsel's interpretation of the United States Supreme Court case of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The trial court declined to grant him any relief pursuant to these two motions. He then filed a Motion for a New Trial alleging his conviction was improper because of irregularity in the indictment that had been handed down more than fifteen years before. This motion was also based upon his counsel's interpretation of the *Apprendi* case. His motion for new trial was denied by a different trial court judge. Oken then appealed (in one fashion or another) the decisions below denying him relief on his varying motions.

His appeal was heard during the same period as the hearing in the case of *Borchardt v. State,* 367 Md. 91, 786 A.2d 631 (2001). Oken's counsel was also counsel for Borchardt. The filing of this Court's opinion in the *Borchardt* case (and the

filing of the Court's opinion in the case *sub judice* ) was delayed for over five months, partially because the Court wanted to consider a case presented by the defense in the *Oken* case that had been proffered as applicable in the two cases. Once the applicability of that case was resolved, we filed the Court's opinion in *Borchardt,* and then filed the Court's opinion in the instant case, adopting our reasoning in *Borchardt.* As I indicated above, one of the reasons for the delay in the filing of the opinions in the instant case and in the *Borchardt* case, was created by counsel bringing to the Court's attention a case counsel proffered was applicable. The Court ultimately found the case referred at that late date, to be inapplicable to both cases.

Counsel has now referred another inapplicable case to this Court as the basis for further delay by way of a stay of execution in this case. That inapplicable case is the case of *Arizona v. Ring,* 200 Ariz. 267, 25 P.3d 1139, *cert. granted,* —— U.S. ——, 122 S.Ct. 865, 151 L.Ed.2d 738 (2002). The *Apprendi* issue in *Ring* is whether the sentencing method in Arizona, where the judge, not a jury, determines the sentence in a death penalty case, remains constitutional under *Apprendi's* holding. The Supreme Court had previously held in *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), that Arizona's judge sentencing scheme was constitutional. The actual question upon which certiorari was granted in *Ring* is represented to be:

> "Should *Walton v. Arizona* be overruled in light of this court's subsequent holding, in *Apprendi v. New Jersey,* that for [the] legislature to remove from jury assessment of facts that increase [the] prescribed range of penalties to which [a] criminal defendant is exposed violates defendant's Sixth Amendment right to jury trial?"

*Oken was tried and sentenced by a jury.* We do not have in Maryland, in death cases, a sentencing scheme where the imposition of sentence is always by a judge. It is the defendant's choice to be sentenced by a jury or a judge.

Additionally, Ring's argument in his petition is summarized by him as:

"This Court's recent decisions place the continued viability of *Walton* in grave doubt.... There can be no serious question that this issue, which goes to the constitutionality of the capital sentencing schemes currently in place in nine States, is one of substantial public importance.... *Walton* must and should be reexamined promptly...."

It is clear that *Ring* is a case limited to the constitutionality of state statutes where sentencing in capital cases is limited to judges. The capital sentencing scheme at issue in *Ring* applies only in nine jurisdictions. Maryland is not among those jurisdictions. Every argument made in the Petition for Writ of Certiorari in *Ring* is specifically referenced to the *Walton* holding that found constitutional the Arizona capital sentencing scheme where judges, and only judges, are permitted to impose the death sentence and in the process required to make factual findings, a scheme completely unlike Maryland's. The arguments in *Ring's* petition include: "Furthermore, a number of State and federal courts, including the Arizona Supreme Court in this case, have noted the irreconcilability of *Walton* and *Apprendi*." "It is plain that the continued viability of *Walton* is in grave doubt...." "Moreover, the question of *Walton's* continued viability directly governs the constitutionality of the capital sentencing schemes in effect not only in Arizona, but also in Montana, Idaho, Nebraska, Colorado, Florida, Alabama, Indiana, and Delaware." (Footnotes omitted.) "As long as *Walton* remains unexamined by this Court, every death sentence imposed, and every death sentence carried out, ... [in] Arizona, the eight other States enumerated above, ... will be under a heavy cloud of constitutional doubt." "*Apprendi* held that with the exception of the fact of prior conviction, every *finding of fact* that raises the maximum punishment to which a defendant may be subjected *must be made by a jury*." (Some emphasis added.) "Arizona's capital sentencing scheme provides that the maximum penalty to which a criminal defendant is exposed may be

increased on the basis of factual findings *made unilaterally by a judge."* (Emphasis added.)

It is clear that *Ring* concerns only the constitutionality of a capital sentencing scheme where only a judge is permitted to determine the sentence, and in that process is permitted to make factual findings. Under the system in Maryland, when a defendant, such as Oken chooses to be sentenced by a jury, the judge is not involved, pre-sentencing, in any factual determinations. *Ring*, in my view, simply does not address any determinative issue present in the Maryland capital sentencing scheme and the purported reliance on it by Oken is merely an assertion that is being used solely for purposes of delay.

Oken, in responding to the State's answer to his request for a stay, proffers that two other cases have since been petitioned to the Supreme Court. Neither of these two cases, *United States v. Harris*, 243 F.3d 806 (4th Cir.2001), *cert. granted in part*, —— U.S. ——, 122 S.Ct. 663, 151 L.Ed.2d 578, 2001 U.S. LEXIS 10961 (2001) and *United States v. Cotton*, 261 F.3d 397 (4th Cir.2001), *cert. granted*, —— U.S. ——, 122 S.Ct. 803, 151 L.Ed.2d 689 (2002) are death penalty cases and thus are not subject to the Supreme Court's clear statement in *Apprendi* that *Apprendi* does not apply to capital sentencing schemes. In an opinion written by Judge Diana Gribbon Motz, Harris was convicted for carrying a handgun while drug trafficking. She held that "brandishing" was a sentencing factor, not an element of the offense. The question presented to the Supreme Court is, "Given that a finding of 'brandishing', as used in 18 U.S.C. Sec. 924(c)(1)(A), results in an increased mandatory minimum sentence, must the fact of 'brandishing' be alleged in the indictment and proved beyond a reasonable doubt?" *Oken* does not involve mandatory minimum sentencing, nor does the Maryland procedure questioned in *Oken* increase the statutorily established maximum penalty of death. Moreover, there is no penalty in this world beyond death.

*Cotton* was a case in which the State failed to allege in the indictment the amount of narcotics involved when it was

prosecuting an aggravated drug case. The Fourth Circuit Court of Appeals found that, as a result, he was *convicted* of an offense for which he had not been charged.

Even if the defendants in *Harris* and *Cotton* prevail, I can see no impact on the case *sub judice.*

It is true that Oken has until early April to file a Petition for Certiorari with the Supreme Court, but he can file it at any time. In fact, if this Court were to decline to issue a stay, I have absolutely no doubt that a Petition would be filed with the Supreme Court before the date Oken's sentence is to be executed, along with the filing of a petition for stay of execution. He does not have to wait until the deadline to file his petition, although, with the granting of this Court's stay by the majority, I anticipate that he will wait, understandably, until the last day in order that the execution of his sentence will be further delayed even if the Supreme Court declines to hear his case. It is not like the *Apprendi* issue is new to his counsel. His counsel, in this and other death penalty cases, has been litigating *Apprendi* issues in this Court for a year. He can, should he choose to do so, now or post-petition to that Court, request the Supreme Court to issue a stay. That Court is in a better position than is this Court to know whether it intends to address the *Apprendi* issue in a non-*Ring* context.

It has been over fifteen years since this serial murderer was first convicted of this murder and sentenced to death. His victims' families have been waiting for the process to end for more than a decade. Now, because of a case out of Arizona that has only a remote connection, if any at all, to the present case, this Court grants a stay of the execution of the sentence. This is twice in the last ten months that this case has been delayed by the claim that some other case has pointed out an *Apprendi* issue impacting this case. By the time the claim of *Ring* is rejected as to the Maryland sentencing scheme and the claims of *Harris* and *Cotton* are disposed of, some other state in some other, or even similar, manner will publish still another case with *Apprendi* issues. At that point, Oken will be back before this Court requesting another stay. I suppose

he will find the votes for the granting of stays, *ad infinitum.* The present members of this Court will ourselves be dead and gone and creative lawyers will still be presenting foreign *Apprendi* cases, *albeit* to our successors.

I have great respect for my colleagues on the Court and acknowledge that the position they have taken is one with which they are legally comfortable and is a position they feel is dictated by their ethical and professional responsibilities. Nonetheless, it is my feeling of obligation to what I believe is *my* ethical and professional responsibility that compels me to note that, after four trial court decisions decided against him, one United States District Court decision against him, one Fourth Circuit Court of Appeals decision decided against him, four unfavorable decisions by Maryland's highest Court (counting a denial of a motion to reconsider), and three occasions when the Supreme Court has declined to review the case, and, not the least, after fifteen years, there comes a point, even in death penalty cases, when judges should say that enough is enough.